Dwight COLEMAN, Lester Crowsheart, Sharon Crowsheart, Russel Folmer, Anna Mae Folmer, George Hatfield, June Hatfield, Donald McCabe, Diane McCabe, Gary Barrett, Rosemary K. Barrett, Richard L. Harmon, Betty J. Harmon, Larry L. Robertson, Nancy K. Robertson, Ross Wade and Maureen Wade, on behalf of themselves and others similarly situated, Plaintiffs,

v.

John R. BLOCK, Secretary of Agriculture; Charles W. Shuman, Administrator of the Farmers Home Administration; Ralph W. Leet, State Director of the Farmers Home Administration; Harold T. Aasmundstad, Glen W. Binegar, Allen G. Drege, Dennis W. Larson, Odell O. Ottmar, and Joseph J. Schneider, as District Directors of the Farmers Home Administration for North Dakota; and Samuel Delvo, Lorace Hakanson, Larry Leier, Charles Schaefer and James Well, as County Supervisors of the Farmers Home Administration in North Dakota, Defendants.

Civ. No. A1–83–47.

United States District Court, North Dakota, Southwestern Division.

Feb. 17, 1984.

---

Sarah M. Vogel, Grand Forks, N.D., for plaintiffs.

Arthur R. Goldberg, Atty., Dept. of Justice, Civil Div., Washington, D.C., Gary Annear, Asst. U.S. Atty., Fargo, N.D., for defendants.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

A history of the Farmers Home Administration is a history of government programs addressed to financial assistance for small farm operators. The scope and development of the programs reflect a recognition by the government, and in particular Congress, that a strong and stable farm economy is vital to the welfare of the nation.

The Farmers Home Administration traces its origin to the Resettlement Administration, a New Deal rural rehabilitation agency created by executive order in 1935[1] to help farm families retain their land despite drought and depression. By passage of the Bankhead-Jones Farm Tenant Act, Congress created a comprehensive program of financial aid to farmers who lacked other sources of credit.[2] The Water Facilities Act of 1937 supplemented this Congressional farm program.[3] These depression loan programs were the beginning of what is now a far-flung undertaking by the United States government to bolster the credit position of practically all farm operations, farm related businesses, and rural towns and communities.

In 1938 the developing farm programs were first brought together in a new agency, the Farm Security Administration (FSA), a division within the Department of Agriculture.[4] As the financial assistance programs continued to expand, they were revised and reorganized by the Farmers Home Administration Act of 1946.[5]

The program was once again revised into its present form as part of the Agricultural Act of 1961, and specifically Title III, the Consolidated Farmers Home Administration Act of 1961.[6] The Consolidated Farmers Home Administration Act and its amendments have generated a substantial body of federal regulations, which are found generally at 7 C.F.R. §§ 1804.61 to 2045.1756 (1983).[7]

This case has arisen out of a series of administrative decisions made primarily by the responsible national-level officers of FmHA as they attempted to apply the statutes and regulations now in existence to an increasing number of farm borrowers in various degrees of financial crises. Situated between the policy-makers in Washington and the farmers that have been

1. Farmers Home Administration, This is FmHA: Short History of Farmers Home Administration 20 (Program Aid No. 973 1980) (hereinafter cited as Short History).

2. 7 U.S.C. §§ 1000–27. Substantially all of the Bankhead-Jones Act has been repealed over time.

3. 7 U.S.C. § 1921. See H.Rep. No. 753, 87th Cong., 1st Sess., reprinted in 1961 U.S.Code Cong. & Ad.News 2241, 2306.

4. Short History, supra note 1, at 20; 12 U.S.C. §§ 1150, 1150a.

5. H.Rep. No. 753, supra note 3, at 2306.

6. Id. at 2305. An excellent description of the history of farm credit legislation is contained in Curry v. Block, 541 F.Supp. 506, 509–11 (S.D.Ga. 1982).

7. Unless otherwise specified, all further citation to the Code of Federal Regulations refer to those codified in the 1983 version of C.F.R.

subject to their decisions and regulations are hundreds of state FmHA officers charged with implementing the FmHA program. These state employees have had the unenviable task of balancing the FmHA's function as a form of social welfare [8] with the realities of operating a loan program. Their task has not been made any easier by confusing legislative enactments and a plethora of complicated and interconnected regulations.

The heart of this suit concerns the interpretation and application of 7 U.S.C. § 1981a and the legality of the FmHA appeal procedures. This suit was initiated on March 11, 1983, by nine North Dakota farmers who alleged, among other things, that FmHA had refused to allow the farmers' applications for deferment of loans under 1981a, terminated funds to farmers for necessary living and operating expenses, and subjected farmers to a biased and unconstitutional appeals process. These plaintiffs also sought to represent a statewide class of persons similarly situated.

On May 5, 1983, this Court certified the North Dakota class under Rule 23(b)(3) and granted a preliminary injunction. 562 F.Supp. 1353 (D.N.D.1983). A three-day trial on the merits was begun on September 20, 1983. Plaintiffs submitted a request on the same date to expand the class to one of national scope. Following a hearing on the motion, plaintiffs were given permission to amend the complaint to include persons similarly situated throughout the United States. 100 F.R.D. 705 (D.N.D. 1983). This order excluded persons or classes presently before another court on the same matters. On November 14, 1983, the Court entered a preliminary injunction applying to the national class. 580 F.Supp. 192 (D.N.D.1983).

Following a status conference that was held on November 21, 1983, the Court issued a pretrial order requiring the consolidation and clarification of pending issues, creating a uniform system for the filing of amicus briefs, and developing a tentative schedule regarding discovery, submission of supplemental briefs, and an additional trial on the merits. The additional trial on the merits became unnecessary on January 3, 1984, because the parties entered, and the Court accepted, a stipulation that the Court's final judgment could be based on the initial trial on the merits.[8A] The case was taken under advisement following final oral arguments given on January 9, 1983.

### STATUTORY AND REGULATORY BACKGROUND

#### A. FmHA's Loan Authority and Borrower Eligibility

FmHA is authorized to make two basic categories of loans to borrowers. First, FmHA may make loans under Title V of the Housing Act of 1949,[9] principally to help people in rural communities purchase or improve homes. Second, FmHA is permitted to make loans under the Consolidated Farm and Rural Development Act (CFRDA loans or farm loans) [10] to assist farm operations. This case centers on CFRDA loans.

The CFRDA consists of four subtitles. Subtitle A [11] permits FmHA loans for farm-related real estate (e.g., loans for obtaining, enlarging or improving farm property) and loans for other rural enterprises. Subtitle

---

**8.** *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 735 [99 S.Ct. 1448, 1462, 59 L.Ed.2d 711] (1979).

**8A.** The stipulation also provided that "the evidence and testimony submitted by witnesses for both parties at the trial ... in connection with the North Dakota class action is representative and typical of the evidence and testimony concerning FmHA practices and borrowers' experiences which would be submitted by borrowers and FmHA employees and officials from throughout the United States ... in connection to the national class action." Doc. No. 104 (Jan. 3, 1984).

**9.** 42 U.S.C. §§ 1471–90j (1976) (as amended).

**10.** 7 U.S.C. §§ 1921–96 (1976) (as amended).

**11.** 7 U.S.C. §§ 1922–34 (1976) (as amended).

B [12] authorizes FmHA operating loans for family farms. Subtitle C [13] permits FmHA emergency loans in cases of natural disaster.[14] Subtitle D [15] addresses general administrative matters.

With one exception applicable to emergency loans,[16] borrowers are eligible for FmHA farm loans only if they are unable to obtain credit elsewhere and have a continuing inability to obtain reasonable financing from other sources.[17] It is the ultimate goal of the CFRDA to "graduate" individual borrowers to a status where further governmental lending is not required.[18] The terms and conditions of specific FmHA farm loans will vary depending on the particular circumstances of the borrower. Likewise, interest rates vary depending on the nature of the loan and on the borrower's situation.[19] For all CFRDA loans, including subtitle C loans, the Secretary is generally instructed to make such loans conditioned upon the full personal liability of the borrower and such security as the Secretary deems appropriate.[20]

### B. Loan Deferrals and Other Servicing Alternatives

In the context of the CFRDA, "deferral" means to postpone the payment of part of a loan installment.[21] Following the enactment of 7 U.S.C. § 1981a in 1978, the Secretary issued payment deferral regulations for farm loans.[22] The regulations specif-

ically instruct FmHA county supervisors, the officials in charge of overseeing individual FmHA loans, to defer farm loan payments in cases of temporary inability to pay due to circumstances beyond the borrowers control.[23] In all cases in which a loan payment deferral is allowed, FmHA's forbearance is based on the premise that there is some reasonable expectation that the account will ultimately be paid.[24] In this connection, the FmHA county supervisors are instructed not only to take into consideration the actual repayment ability of the borrower, but also whether the borrower has been cooperating in the servicing of the account and the maintenance of the security.[25] The regulations pertaining to FmHA farm loans and rural housing loans are, in certain respects, comparable since an allowance of a formal deferral of loan payments is dependent on a temporary inability of the borrower to pay his FmHA obligation for reasons beyond his control.[26]

Other loan servicing alternatives, in addition to deferral, are available to FmHA borrowers under the current regulations. Borrowers may "reschedule" or "consolidate" operating and emergency loans (i.e., non-real estate loans) made for subtitle B purposes.[27] "Rescheduling" means rewriting the rates or terms of a loan.[28] "Consolidating" means combining and rescheduling the rates and terms of two or more loans.[29]

---

12. 7 U.S.C. §§ 1941–47 (1976) (as amended).

13. 7 U.S.C. §§ 1961–71 (1976) (as amended).

14. Subtitle C loans are not subject to the same maximums as other CFRDA loans and can be made for any subtitle A or B loan purpose.

15. 7 U.S.C. §§ 1981–96 (1976) (as amended).

16. See 7 U.S.C. § 1961(b) (1976) (as amended).

17. See 7 U.S.C. § 1983 (1976) (as amended).

18. Id.

19. See 7 U.S.C. §§ 1927(a), 1946, 1964 (1976) (as amended). Where circumstances warrant, loans can be made at special low interest rates. See 7 U.S.C. §§ 1927(a)(3)(B), 1934, 1946(a)(2), 1964(b)(1) (1976) (as amended).

20. See, e.g., 7 U.S.C. §§ 1925, 1927(c), 1946, 1964(d) (1976) (as amended).

21. 7 C.F.R. § 1951.33(a)(4).

22. See 7 C.F.R. §§ 1951.33, 1951.40.

23. 7 C.F.R. §§ 1951.33(e), 1951.40(b)(2)(ii).

24. 7 C.F.R. §§ 1951.33(e)(1)(ii), 1951.40(b)(2)(v).

25. See 7 C.F.R. §§ 1951.33(b), 1951.40(b)(2).

26. See id.; cf. 7 C.F.R. § 1951.313(a)(2).

27. 7 C.F.R. § 1951.33.

28. Id., subd. (a)(2).

29. Id., subd. (a)(3).

With regard to real estate loans, similar servicing options are available. The basic servicing device is "reamortization," which means rearranging the installments of a loan, an action that may include changing its interest rate and terms.[30]

In addition, the statute provides a number of other methods to aid farmers with special payment problems or special needs. For example, the Secretary's emergency loan authority under subtitle C of the CFRDA authorizes aid to farmers who experience financial difficulties because of natural disasters or other reasons beyond their control. One other servicing method, the tool most frequently used to avoid foreclosure, involves a postponement of loan payments, a device by which FmHA carries a borrower in default for a set or indefinite period of time until payments can be made.

### C. Release of Chattel Security

In connection with either emergency or farm operating loans under the CFRDA, chattels such as machinery, crops, or livestock are pledged as security by the borrower. The release of that security, and the income derived from it, is governed by 7 C.F.R. § 1962.17 which provides, in part:

> Chattel security may be released only when release will not be to the financial detriment of FmHA. Borrowers will be strictly accountable to FmHA for the proper use of proceeds from the sale of security. Insurance proceeds will be treated the same as sale proceeds. The authority to release security for FmHA loans is different for basic security than for normal security.

"Basic security" is essentially the equipment or livestock which serve as the basis for the farming operation.[31] "Normal income security" is all other non-real estate security which is sold in the normal course of operating the farm.[32] There are explicit limitations on when a county supervisor may release normal income security. Basically such security may be released to pay 1) debts to FmHA, 2) operating expenses of the farm and home, 3) debts of the farm and home incurred for operating expenses, 4) income or social security taxes, 5) creditors with liens superior to FmHA liens, and 6) debts owed on essential real estate to creditors other than FmHA.[33]

On finding that the amount of income originally planned for the year will not be received, the county supervisor determines, in consultation with the borrower, how to use income that is available or will become available during the remainder of the planned year.[34] If other creditors have liens on the property from which the normal income is received, they must also be consulted. Priorities in distributing the income that will be available are as follows:

1. Pay necessary farm, home and other expenses planned for payment by cash as incurred;

2. Probate repayments on credit advanced for necessary farm, home and other operating expenses to FmHA and other creditors; and

3. Make planned payments on other debts.

Release of both basic and normal income is based on information obtained from the borrower's operations as shown on his Annual Farm and Home Plan and Long-Time Farm and Home Plan.[35]

### D. Acceleration and Notice of Right to Appeal

The Secretary administers loans through the local county supervisor pursuant to 7 C.F.R. § 1924, Subpart B. The county supervisor is responsible for assisting the farmer in planning for and operation of his farm. Sections 1924.57(b) and (c) provide that the applicant or borrower will complete plans as required by FmHA and that

---

30.  7 C.F.R. § 1951.40(a)(1).

31.  7 C.F.R. § 1962.17(a).

32.  *Id.,* subd. (b).

33.  7 C.F.R. § 1962.17(b).

34.  7 C.F.R. § 1962.17(c).

35.  7 C.F.R. § 1962.17(d).

the county supervisor will assist the applicant or borrower in completing the plans required.[36]   Section 1924.60 provides that the county supervisor assists the borrower in evaluating and reviewing the operation and its progress, problems, and corrective actions needed.   Based on these plans and evaluation of the progress or lack of progress of the business, the county supervisor must determine whether or not a loan will be continued.

In ordinary circumstances, FmHA releases its lien on the proceeds of a borrower's crops and livestock in order to permit the borrower to make payments in accordance with the Farm and Home Plan he has worked out with FmHA.   Under this plan allowances are set for farm operating and family living expenses, and for years where the income received falls below expected income, priority is given to paying the necessary farm and home expenses planned for payment by cash as incurred.[37]

However, when the county supervisor believes that the borrower is in "default," as that term is specially defined in 7 C.F.R. § 1962.4(g),[38] he can decide whether to "liquidate" the loan.[39]   In making this decision the county supervisor must get the advice or recommendation of the district director or county committee for loans secured by chattels and the state director for loans secured by realty.[40]   The decision is made at a delinquent and problem case review by a county supervisor and the district director.   *The farmer is not notified of the review until after it is completed.*   Once the decision to liquidate is made, FmHA decides whether to release its lien on the proceeds of the borrower's crops or livestock.   *Generally no release of proceeds is granted since the priority formerly given to living and operating expenses is negated by the decision to liquidate.*[41]   Moreover, the regulations allow only one exception to the full liquidation rule, and that exception is limited to $600.00.[42]   A decision not to release FmHA liens in effect cuts off the borrower's income stream, unless the borrower has another source of income.

### E.   FmHA Administrative Appeal Procedure

Once the decision to liquidate the loan is made, many borrowers "voluntarily" sell off their property to pay the FmHA debt. If the borrower does not do so, sixty days after the decision to liquidate, FmHA gives the borrower notice that the loan is being

**36.**  Two forms essential to planning and analysis under section 1924.57 are Long-Time Farm and Home Plan and the Annual Farm and Home Plan.

**37.**  *See* 7 C.F.R. § 1962.17(c)(1), (d).

**38.**  The regulation defines default as follows:
(g) *Default.*  Failure of the borrower to observe the agreements with FmHA as contained in notes, security instruments, and similar or related instruments.  Some examples of default or factors to consider in determining whether a borrower is in default are when a borrower:
(1) Is delinquent, and the borrower's refusal or inability to pay on schedule, or as agreed upon, is due to lack of diligence, lack of sound farming or other operation, or other circumstances within the borrower's control.
(2) Ceases to conduct farming or other operations for which the loan was made or to carry out approved changed operations.
(3) Has disposed of security or EO property without FmHA approval, has not cared properly for such property, has not accounted properly for such property or the proceeds from its sale, or taken some action which resulted in bad faith or other violations in connection with the loan.
(4) Has progressed to the point to be able to obtain credit from other sources, and has agreed in the note or other instrument to do so but refuses to comply with that agreement.

The FmHA concedes that the liquidation decision rarely turns on whether the farmer is delinquent. *See* Tr. T. at 30, 11. 14–15 (Leet); 64, 11. 6–7 (Aasmundstad); 140, 11. 19–23 (Binegar); 218, 11. 23–24 (Drege); 250, 1. 17 (Larson). Instead, the decision rests on a host of highly subjective factors, some of which are listed in the regulations at 7 C.F.R. §§ 1960.5(a)(1)(i–x), 1960.5(a)(2).

**39.**  *See* 7 C.F.R. 1962.40 (chattel loans); 7 C.F.R. § 1872.17 (real estate loans).

**40.**  7 C.F.R. § 1872.17; 7 C.F.R. § 1962.40(a).

**41.**  *See* 7 C.F.R. § 1962.40.

**42.**  7 C.F.R. § 1962.40.

accelerated, so that the balance owing is due immediately.[43] At this point, the borrower is notified for the first time that he has a right to appeal the decision to liquidate and is told that he has thirty days to request an appeal of the county supervisor's decision to accelerate the loan.[44] The hearing may then be scheduled within forty-five days of the request[45] and the hearing officer will generally render a decision within thirty days of the hearing.[46]

In appeals from decisions to accelerate loans secured by chattels, the hearing officer is the district director. In appeals from decisions to accelerate loans secured by real estate, the hearing officer is the district director from another district or a person not involved in the initial decision as designated by the state director.[47]

## DISCUSSION

### Impact of *Allison v. Block*

On December 28, 1983, the United States Court of Appeals for the Eighth Circuit rejected "the Secretary's assertion that Congress left the implementation of section 1981a a matter of unfettered administrative discretion" and ruled that "section 1981a creates a right to have certain uniform procedures established and requires the Secretary to develop substantive standards applicable to deferral applications." *Allison v. Block*, 723 F.2d 631 at 635, 634 (8th Cir.1983). The ruling in *Allison* is controlling law in this case. Therefore, the Court rejects the government's arguments that 1981a is permissive and that the FmHA's existing deferral regulations are adequate. *See id.* at 633–38. Also the Court rejects the plaintiffs' arguments that

the Secretary must promulgate regulations to implement 1981a and that the Court should require a further level of administrative review pursuant to 1981a with respect to denial of deferral relief.[48] *See id.* at 637–38.

The *Allison* decision does not resolve the following issues:

1. Whether the Administrative Procedures Act's provisions on administrative appeal hearings apply to FmHA foreclosure, acceleration, and denial of deferral hearings;

2. Whether the existing FmHA appeal regulations meet minimal due process requirements;

3. Whether plaintiffs' motion for leave to amend the class action complaint should have been granted;

4. Whether the nation-wide class is adequately defined;

5. Whether the preliminary injunction should be modified; and

6. Whether the injunction should be permanent.

*I. Whether the Administrative Procedures Act's provisions on administrative appeal hearings apply to FmHA foreclosure, acceleration, and denial of deferral hearings.*

■ The provisions of the Administrative Procedures Act (APA), 5 U.S.C. §§ 551–76 (1976) (as amended), apply to "every case of adjudication required by statute to be determined on the record after opportunity for a hearing." *Id.* § 554. Under 7 U.S.C. § 1983(b), "the Secretary *may* provide for appeal and review" of

---

**43.** 7 C.F.R. § 1872.17(b).

**44.** 7 C.F.R. § 1900.56(a)(3).

**45.** 7 C.F.R. § 1900.56(c)(3).

**46.** 7 C.F.R. § 1900.57(g).

**47.** 7 C.F.R. § 1900, Subpart B, Exhibit D.

**48.** *Allison* recognizes the requirement for a "clearly articulated" decision that is "susceptible to judicial review for abuse of discretion." *Id.* at 638, *citing, City of West Chicago v. United*

*States Nuclear Regulatory Comm'n*, 701 F.2d 632, 648 (7th Cir.1983). Regulation 7 C.F.R. 1900.53(a) states that "FmHA decisions based on statutory requirements or on objective standards that are included in published regulations may not be appealed." This provision apparently bars all FmHA appeals based on section 1981a. Instead, the agency decision can be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976) (as amended).

county committee determinations.[49] A plain reading of these two statutes demonstrates that the APA does not apply to FmHA foreclosure, acceleration, or denial of deferral hearings.

Plaintiffs advance three arguments for application of the APA. First, plaintiffs contend that the language contained in § 1983(b) "is far stronger than found in many statutes where the Secretary has provided [APA] protection." Obviously this does not alter the statutory requirement of 5 U.S.C. § 554. Moreover, the fact that the Secretary has applied the APA to other areas, even areas that are perhaps not so deserving of protection, shows nothing more than the Secretary's power of discretion in this regard. Nor does the record contain sufficient evidence that the Secretary's refusal to apply the APA in this area constitutes an abuse of discretion,[50] especially in light of *Mathews v. Eldridge,* 424 U.S. 319 [96 S.Ct. 893, 47 L.Ed.2d 18] (1976).

Plaintiffs' second argument concerns the legislative intent surrounding the inclusion of the § 1983(b) proviso concerning appeal. Plaintiffs emphasize a portion of the House report which states that by adding the proviso "FmHA would be able to rectify any inequities which may result from county committee recommendations, certifications or other authorized actions." H.Rep. No. 986, 95th Cong., 2d Sess. 39, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1106, 1144. The report also states, however, that the authority to provide for appeal procedures "would be used in only a limited number of cases" and that the proposed

addition "amends ... the act to *authorize* the Secretary to provide a procedure for appeal and review" of county committee actions. *Id.* (emphasis added). This legislative history does not support the conclusion that § 1983(b) demands application of the APA.

■ Plaintiffs' final argument concerns whether the APA must apply to hearings that are constitutionally required by this order. In support of this contention, plaintiffs cite *Wong Yang Sung v. McGrath,* 339 U.S. 33, 50 [70 S.Ct.445, 454, 94 L.Ed. 616, 628] (1949), which holds that the APA language "required by statute" includes hearings held by constitutional compulsion. But this expansion does not alter the primary limiting requirement that the adjudication must be "determined on the record" before the APA provisions apply, and under the ruling of *Mathews v. Eldridge* a constitutionally mandated hearing may be held without requiring the formality of making a record of the proceedings. Unless the constitutionally required adjudication must be determined on the record, the APA does not apply.

## II. Whether the existing FmHA appeal regulations meet minimal procedural due process requirements.

■ The decision to liquidate results in a major restructuring of the relationship between the borrower and the government lender. The dual responsibility of running a form of social welfare legislation while administering a loan program immediately transforms into a single focus: reducing

---

**49.** (Emphasis added). FmHA regulations provide for an "informal proceeding" in which "the taking of transcripts is neither required nor prohibited." 7 C.F.R. § 1900.57(a), (d)(1)(ii). The only requirement of a record is the taking of notes at the hearing by a FmHA employee who did not make the initial decision that is being appealed. 7 C.F.R. § 1900.57(d)(2). These notes "will *informally reflect* the pertinent information presented and essential positions of both parties. The notes *may be in outline form,* and *need not repeat proceedings* verbatim.... A typed copy of the notes will be mailed or presented to the appellant together with the letter informing the appellant of the hearing

officer's decision." 7 C.F.R. § 1900.57(d)(3) (original emphasis retained). Otherwise, the hearing officer is merely "encouraged" to tape record the hearing. 7 C.F.R. § 1900.57(d)(1).

**50.** *See City of West Chicago v. United States Nuclear Regulatory Comm'n,* 701 F.2d 632, 648 (7th Cir.1983). *See also* 2 Fed.Proc., L.Ed. § 2:94 at 90 (1981): "A commentator has noted that possibly 90 percent of the government's work consists of informal action outside the Administrative Procedures Act ...," *citing* Gardner, *The Procedures by Which Informal Action is Taken,* 24 Ad.L.Rev. 155 (1972).

the loss incurred. In regards to the release of proceeds and all other general day-to-day decisions, no consideration is given to the possibility that liquidation should not have occurred. After the unilateral decision to liquidate is reached, "it is FmHA policy to liquidate *all* security ...." 7 C.F.R. § 1962.40 (emphasis added). The only exception is for "EO property that the county supervisor determines is essential for minimum family needs," but not in excess of $600.00. *Id.* The county supervisor then attempts to persuade the farmer to voluntarily liquidate. It is only after progress in obtaining a "voluntary" liquidation has stopped, or sixty days after FmHA has frozen the farmer's income stream by refusing to release his crop proceeds, that FmHA first informs a farmer-borrower of a right to appeal from the decision to liquidate. 7 C.F.R. § 1900.56(a)(3). Such a system does not comport with basic procedural due process considerations.[51]

There is deeply embedded in the law, and the Uniform Commercial Code reflects, a distinction between farm products (U.C.C. § 9–109(3)), on the one hand, and equipment (U.C.C. § 9–109(2)) and inventory (U.C.C. § 9–109(4)), on the other hand. This difference, although not precise, is important because it points us towards a fundamental element of our social thinking, *i.e.*, the biblical injunction that "a laborer is worthy of his hire." The "hire" of the farm operator is basically the crop he raises, whether it be a crop of produce for commerce (wool), produce for animal use (hay), or produce for human use (vegetables or fruit). Various examples in the law, such as wage protection in garnishment statutes, wage claims priorities in bankruptcy proceedings, specific exemptions of growing crops from process, *e.g.*,

N.D.C.C. 28–22–02 (1974), and specific restraints as to crop production liens, *e.g.*, N.D.C.C. ch. 35–07, –08, –09 (1972), all reflect a concern for the person without whose labor the production would not occur. The farmer's interest in his produce is as real as that of the worker's interest in his wages. *See Sniadach v. Family Finance Corp.*, 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969). In fact, intentionally or otherwise, FmHA recognizes the concept of products of "hire." *See* 7 C.F.R. § 1962.17(a), (b).

Two factors which emphasize the inadequacy of the existing FmHA procedures to reflect this principle are first, that as to chattel mortgages, the borrower, as the weaker party, has no option but to include in chattel mortgage security all supplies, equipment, and produce therefrom including growing crops—i.e., all fruits of labor. For, while under 7 U.S.C. §§ 1925, 1927(c), 1946, 1964(d), the Secretary shall take such security as he deems appropriate, in fact, where the loan is addressed to the production of the crop, for example calves, the security instrument assures that those calves come under its control as fast as they are born. *See* Ex. 5, USDA Form 440–4ND (Folmer). This means that a decision to liquidate freezes the debtor's income stream, except for the $600.00 allowance discussed above. The debtor who now receives nothing towards support of his family from his effort must care for the animals and the crops on the place, let them starve or waste, or "voluntarily" sell out.

Second, before a decision is unilaterally made by the county supervisor to freeze the stream of income by "liquidating" the loan, and since the FmHA has already provided a right to an appeal process, that

---

51. *See also* Judge Alsop's view on this matter: "[T]he court is concerned about the apparent unfairness that permeates the liquidation stage of FmHA's procedures. The liquidation decision is made by FmHA, sometimes without consulting the borrower. The borrower is not informed that this decision is appealable until he or she receives notice of acceleration, some 60 days after the liquidation decision. During the interim, the borrower is subtly or overtly pres-

sured into 'voluntarily' liquidating. Many borrowers are uninformed of their alternatives and believe they have no choice but to liquidate. It seems to this court that, due process considerations aside, basic notions of fairness dictate that FmHA inform the borrower of the right to appeal when it informs him or her of the liquidation decision." *Gamradt v. Block*, 581 F.Supp. 122, 134–35 (D.Minn.1983) (footnote omitted).

process must be at a meaningful time and in a meaningful manner. *Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902.[51A]

The FmHA program is, after all, a program addressed to helping a farmer who needs help. While Congress has seen fit to direct FmHA to utilize established doctrines and procedures of commercial law, in fact private financial institutions have a clear primary duty to protect the assets of their investors. But FmHA has a two-fold duty—to assist a special group who needs help, and then, to protect the investor (the United States). In some circumstances, such as liquidation of chattel liens, commercial procedures are not quite appropriate to meet the charitable obligation. For example, under the Uniform Commercial Code a creditor holding a security interest may take possession of a chattel without notice but subject to certain conditions. U.C.C. § 9–503. This privilege is understandable given the primary duty of financial institutions and the difficulty of protecting a security interest in a transportable or destructible chattel. But agencies of the United States, including FmHA, have special criminal statutes to bolster their secured creditor status, *e.g.*, 18 U.S.C. § 658 (1976), which private lenders do not have. And if freezing the stream of income defeats the charitable purpose, that step should only be taken after all reasonable efforts to act wisely have been exhausted.

There is a developing body of law which meets this problem area. The caselaw is anchored on the case of *Goss v. Lopez*, 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725] (1975) and *Mathews v. Eldridge*, 424 U.S. 319 [96 S.Ct. 893, 47 L.Ed.2d 18] (1976). An excellent discussion of the principles developed in these two cases is found in 2 K. Davis, *Administrative Law Treatise* ch. 13 (2d ed. 1979). Due to the quality of the work and its relevance to the primary issues in this case, the Court finds it appropriate to quote it at length.

In the broad perspective of the law of requirement of opportunity to be heard, the law about requirement of opportunity for trial-type hearing is relatively satisfactory, and the correctable injustice is mainly in the area of informal action, that is, the area where trial procedure is not required. Supreme Court law has been devoted almost entirely to the problem of whether or not to require a trial-type hearing. What is needed, and what has only very recently begun to develop in significant degree, is law that deals with problems of procedural justice when trials are inappropriate.

The beginnings that have been made are far more significant than has been generally recognized. The beginnings are in two great cases—Goss and Eldridge. The cardinal proposition of Goss is that on a question of adjudicative fact on which a trial is not appropriate due process may require a notice and opportunity for informal response. The important idea of Eldridge is that a main reason for denying a trial-type hearing may be that the informal procedure the agency has provided is adequate. Those two simple propositions may seem insignificant at first glance, but they may become the foundation for a tremendous superstructure of law that will be concerned with what we are calling "fair informal procedure"—a term that has not generally been a party of judges' vocabulary, but should be.

The potential for improving the quality of procedural justice may be a hundred times as great by operating on the law of informal procedure as by operating on the law of trial procedure, even though throughout the twentieth century the legal professional has probably given a hundred times as much attention to trial procedure as to informal procedure.

\* \* \* \* \* \* \*

---

**51A.** Since the FmHA has adopted an appeal process, regardless of the Constitutional dimension of the issue, it would be capricious to set up an appellate process not meaningful in time

and manner. It is unnecessary to determine whether FmHA is obligated to provide an appeal process pursuant to 7 U.S.C. § 1983(b) (1976) (as amended).

The great case of *Goss v. Lopez*, 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725] (1975), established the Goss principle: In some circumstances due process does not require trial procedure but forbids resolving a question of adjudicative fact against a party without first allowing him to respond informally to a summary of adverse evidence. The principles can probably be applied to millions or billions of informal determinations annually, although it has no applicability to some such determinations. The Supreme Court's enunciation of the principle will cause other courts to insist upon it, and as soon as that becomes clear to administrators they can apply the principle to most of the huge bulk of informal decisions, with hardly any expense or inconvenience but with a significant gain for procedural justice. *The principle has enormous potential, because it can be applied to most informal adjudication and also to most informal action other than adjudication.*

In the Goss case, high school students were suspended for up to ten days without a hearing of any kind. For instance, one was caught in a mass arrest and suspended for 10 days "without ever being told what she was accused of doing or being given an opportunity to explain her presence among those arrested." The Court first held that the interest was protected by due process. Then it held that due process requires "at least" the rudimentary precautions "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581 [95 S.Ct. at 740]. The Court was careful to limit the procedural protection to make it practical: "There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his

version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is." 419 U.S. at 582 [95 S.Ct. at 740].

The holding cuts both ways, for in requiring opportunity to respond to the charges, the Court also refused to require trial procedure, explicitly denying "opportunity to secure counsel, to confront and cross-examine ... to call his own witnesses ... To impose in each case even truncated trial type procedures might well overwhelm administrative facilities." 419 U.S. at 583 [95 S.Ct. at 740]. But it also made clear that longer suspensions "may require more formal procedures."

The Goss principle is clearly and obviously desirable, even though, of course, special circumstances may sometimes make its application inappropriate. But for such factual issues as those involved in the Goss case, the principle seems natural and necessary. A statement that any reasonable person who understands the Goss principle is sure to accept it is not too strong.

\*      \*      \*      \*      \*      \*

[The four dissenting Justices] did not reject the Goss principle. Nothing the dissenters said indicates that they would in any way disagree with the simple statement made at pages 358–359 of the 1970 Supplement to this Treatise: "Little questions of fact which do not justify expensive procedure can be quickly resolved without undue fairness by confronting a party with the evidence against him and listening to what he has to say." That is essentially the Goss principle. It was properly applied to the facts of the Goss case, and it has enormous applicability elsewhere, even though it may be inappropriate for a good deal of agency action.

Although the Supreme Court's recognition of the idea is new, the idea itself is not. Even before Goldberg, the present writer suggested: "The choice is not between requiring every element involved

in a trial-type hearing and dispensing with every such elements; a sensible choice may be to dispense with the hearing but to allow a party to know and to respond to the information considered.... The tendency of courts, aided and abetted by practitioners, has been to refuse to recognize any middle position between requiring a trial-type hearing and not requiring it. Often a trial-type hearing is either too cumbersome or too expensive or both, and yet some procedural protection is desirable. *Often a good procedure is to let a party know the nature of the evidence against him and to listen to what he has to say,* even though, in general, no such procedure is recognized either in statutory law or in case law." Discretionary Justice: A Preliminary Inquiry (1969) 118–119 (italics in original). See also Administrative Law Text (3d ed. 1972) 169, under the heading of "Abridged Trials": "A mighty good procedure—far superior to complete absence of procedural protection—is to confront a party with a summary of the evidence against him and to listen for five minutes to what he has to say ..."

. . . . .

The Goss principle is a true fundamental. As it develops further and as its many applications proliferate, judges and lawyers will soon look back in wonder that the legal system was for so long without it. Many of the most fundamental ideas, after their creators have invented them and after they have become widely understood and integrated into the legal system, appear to be so obvious that their development seems in retrospect to have been inevitable. The Goss principle is one of those fundamental ideas. The Court's enunciation of it is a long step forward in the development of procedural justice.

\* \* \* \* \* \*

American administrative law has developed by stages, with focus first on constitutional foundations, then judicial review, and then rulemaking and formal adjudication. Now that we have entered the present stage of giving attention to justice through informal action, especially when discretionary power is little controlled, the Goss principle can rapidly spread. It should.

2 K. Davis, *Administrative Law Treatise* §§ 13:1 to :2 at 473–78 (2d ed. 1979) (reference to treatise sections omitted).

In the 1982 Supp., Davis discusses the impact of the *Goss* principle on *Mathews v. Eldridge,* 424 U.S. 319 [96 S.Ct. 893, 47 L.Ed.2d 18] (1976):

Exactly as it probably should, the recent law is developing in the direction of enlarging due process protection through the procedure of notice and opportunity for informal response. ... The problem for most of the century was *whether* one was entitled to be heard, and the assumption was that a hearing was an evidentiary hearing with full rights of cross-examination. The new problem, which is the primary focus of recent case law, is *what kind of hearing* one is entitled to. Of course, due process still often requires evidentiary hearings. Yet the longterm but unsound assumption that the alternative to an evidentiary hearing is no hearing is gone; the alternative often is procedure of notice and opportunity for informal response, as in *Goss v. Lopez,* 419 U.S. 565 [95 S.Ct. 729, 42 L.Ed.2d 725] (1975). The law requiring opportunity for evidentiary hearing remains largely the same. The main movement is toward replacing denial of opportunity to be heard with opportunity for informal written or oral response to a statement of adverse facts and reasons.

Although the new law is clearly superior to the old law and although the change may be generally progressing satisfactorily, still two trouble spots need attention. The judicial custom is to take three steps, answering questions (1) whether the interest is or is not protected by due process, (2) if it is, whether due process requires some kind of hearing, and (3) if it does, what kind of hearing is required. The first question is often the

most difficult and the third is often the least difficult, but courts often fail to reach the third question because, largely on the basis of thinking about evidentiary hearings, they say no to the first question, without appreciating the extremely important idea that *nearly all interests that are the subject matter of litigation deserve procedural protection to the extent of allowing a [sic] informal response to the adverse allegations.* Furthermore, the first step should often be avoided because of the frequent falsity of the notion that an interest either is or is not protected by due process; for instance, a nontenured public employee's interest in his job is not protected by due process with respect to right to be heard, *Board of Regents v. Roth*, 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972), but is protected by due process with respect to discrimination. *Davis v. Passman*, 442 U.S. 228 [99 S.Ct. 2264, 60 L.Ed.2d 846] (1979).

Just as an interest may be entitled to due process protection against discrimination but not against denial of an evidentiary hearing, so an interest may be entitled to due process protection against denial of a chance to respond informally to asserted facts and conclusions but not against denial of an evidentiary hearing.

Courts confronted with problems of requiring opportunity to be heard might consider whether they should usually begin with the question whether opportunity for informal response should be required. The answer will usually be yes, and the other questions will be made easier. The most difficult task is to give an all or none answer to the question whether the interest is protected by due process; that question should be postponed until the other steps are taken, and often it may be avoided altogether.

The second trouble spot grows out of the much-quoted statement of the Supreme Court that "identification of the specific dictates of due process generally requires consideration of three distinct factors …" *Mathews v. Eldridge*, 424 U.S. 319, 335 [96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33] (1976). The three factors were soundly applied to the Eldridge problem, which was whether an evidentiary hearing was required before termination of disability benefits, or whether the procedure allowed was enough, including full hearing after termination, with retroactive relief, and including pretermination right to be fully informed and to respond in writing. But the lower courts commonly use the three factors for determining questions for which they are ill-suited, such as whether procedure short of evidentiary hearing is required by due process. The three factors are often misfits, for they do not match the questions to be decided to the main procedural patterns. The courts should recognize that evidentiary hearings are usually appropriate only for resolving disputes about facts pertaining to a particular party and are usually inappropriate for resolving other kinds of questions, such as questions of law, policy, discretion, or broad and general facts that help decide questions of law or policy.

The great contribution of the Eldridge opinion is not the three factors but is the adoption of the essential idea that adequate informal procedure may make trial-type hearing unnecessary and even undesirable. That contribution combines with the Goss principle (that due process may require procedure of notice and opportunity for informal response), to provide a much improved system for assuring procedural justice.

Extremely important is this simple observation, which is often insufficiently understood: For many circumstances, the proper informal procedure provides *better* procedural protection than a full trial.

2 K. Davis, *Administrative Law Treatise* § 13:0 at 235–37 (2d ed. Supp.1982) (references to treatise sections omitted).

As pointed out, *Eldridge* suggests that a threshold problem is still whether the interest is protected by due process, i.e., whether there exists in the mortgaged chattels a property interest protected by the Fifth

Amendment. *Eldridge*, 424 U.S. at 332 [96 S.Ct. at 901]. Whether such a threshold problem is advisable or not, a property interest clearly exists in a chattel mortgage. The distinction between a possessory interest and a security interest, and the relative rights attendant to each interest need not be elaborated here. *See, e.g.,* U.C.C. § 9–501. And even if a property interest is not found, FmHA is obligated to set up a meaningful appeal process. Anything less would be contrary to the Constitution as well as the administrator's legal authority.

■ Therefore, I conclude:

1. The FmHA mortgagor is entitled to receive notice of, and a chance to be heard and to present evidence before the county supervisor acts to liquidate the mortgage and freeze the income stream.

2. The "hearing" above required may be informal, but notes of the hearing, as distinguished from a verbatim record, must be preserved by FmHA.

3. The review procedures as presently established by FmHA is an adequate review procedure, except that it must be re-designed to effect complete review before action is taken to "liquidate." [52]

4. The issue of bias, if raised by the borrower, is capable of determination and review at the later stages of appeal. Obviously a decision made by one who is biased constitutes an abuse of discretion.

*III. Whether plaintiffs' motion for leave to amend the class action complaint should have been granted.*

This issue was resolved by the order dated October 28, 1983. 100 F.R.D. at 705–08. Since defendants' outline of pending matters includes this issue, it will be construed as a motion for reconsideration.

Upon careful reconsideration of the briefs (Doc. Nos. 60, 69, 76, and 77), the relevant orders (dated October 28, November 14, and November 21), and the steps taken to protect defendants from prejudice (such as re-opening discovery and allowing an additional trial on the merits) while attempting to foster judicial efficiency, I conclude that the motion was properly granted.

*IV. Whether the nation-wide class is adequately defined.*

■ Defendants argue that "if issues from *Coleman* have already been raised or decided in a district [or circuit] then the nationwide class should not include the potential members of the class from that district [or circuit] on the issue or issues raised or decided there." At present, the class consists of all persons who have FmHA loans, are eligible for FmHA loans, or may be eligible for FmHA loans, but excludes borrowers who are presently involved in a suit, either as individuals or as members of a state-wide class, which "directly relates to the implementation of 7 U.S.C. § 1981a, the constitutionality of a pre-hearing cut-off of necessary family living and farm operating expenses, and the constitutionality of the Farmers Home Administration appeals procedure." Of course, those persons who have actually litigated their claims and received a final judgment by a court of competent jurisdiction are barred from entering the national class through the principle of res judicata.

Given this procedural setting, the defendants' argument is baffling. Apparently defendants want the Court to fragmentize the national class into dozens of subclasses, each of which is delineated by the "rule of law" of a particular district or circuit, even though the class members were not litigants before any court or personally subject to the ruling in any manner. It is true that if a class member were to bring a suit in a circuit that had resolved a

---

**52.** As to realty, the provision for the period of redemption is a further protection for the debtor.

determinative issue, the district court would be obliged to follow that circuit ruling. But the class members in this suit are not before a different district court, and this Court is obligated to follow the decisions of the Eighth Circuit. Other circuit court rulings, which certainly provide strong persuasive precedent, are not controlling. To hold otherwise would undermine the primary justifications of national class actions: judicial economy and efficiency. *See also* Fed.R.Civ.P. 1. Further piecemeal litigation will benefit no one.[53]

*V. Whether the preliminary injunction should be modified to include specific exceptions.*

Defendants have moved to exclude application of the injunction in situations where there is an emergency (inevitable irreparable injury due to abandonment of the property), no factual dispute (borrower knowingly and voluntarily consents to foreclosure; borrower's conversion conclusively established by admission or judicial determination),[54] or a judicial determination concerning the disposition of the property rights (borrower initiates Chapter 7 bankruptcy and the trustee in bankruptcy abandons the property to the United States or to another lienholder who then commences foreclosure; borrower is discharged in bankruptcy).[55] Upon careful consideration

of the briefs (Doc. Nos. 87, 98, 96) and the oral arguments on this matter (November 21, 1983 at 3–11, January 9, 1984), the injunction will be modified to include the concerns of both parties as to the proposed exceptions.

*VI. Whether the injunction should be permanent.*

■ The Court is obliged to apply a three-step analysis in the determination of whether the injunction should be permanent.[56] This analysis can be outlined as follows:

1. whether plaintiffs have actually succeeded on the merits of their claim;

2. whether the "balance of equities" favors the granting of injunctive relief;

3. determine what form the injunctive remedy should take.

As to the first step, there can be no doubt that plaintiffs have actually succeeded on the merits of their claim. They have been granted the injunctive relief that was the basis of this suit. They have demonstrated by a trial on the merits that their claims are well founded. And they have convinced this Court that the law affords them a remedy.

■ The second step, whether the balance of equities favors the granting of

---

**53.** "The plaintiffs have repeatedly asserted, and the defense has not denied, that the Department of Agriculture's policy is to accept a trial court's order as to the plaintiffs in that particular case, and to continue to apply its own interpretation of the law in all areas where it has not been specifically challenged. This policy, while perhaps proper as a tactical decision, invites numerous lawsuits, all of which must be funded by persons who are suffering financial hardship, else they would not bring the action." Order dated October 28, 1983 at 5.

*See also* Judge Alsop's comment, "It seems unfortunate to this court that substantial amounts of time and taxpayer dollars are being expended to litigate and decide essentially duplicative lawsuits." *Gamradt v. Block,* 581 F.Supp. 122, 126 (D.Minn.1983).

**54.** The evidence showed that FmHA field officers exercise untrammeled discretion in determining whether or not to present a claimed

conversion for criminal prosecution. The fact of criminal prosecution should not limit the opportunity for a plaintiff to apply for a deferral. *See also United States v. Hamrick,* 713 F.2d 69, 70 (4th Cir.1983).

**55.** Defendants have also requested that the injunction not apply to situations where a third-party lienholder initiates foreclosure. The Court fails to perceive any justification for such an exclusion. When FmHA is in the position of junior lienholder, it will have the option of either bidding at the sale or asserting its right of redemption.

**56.** *E.g., Minnesota Public Interest Research Group v. Butz,* 358 F.Supp. 584, 625 (D.Minn. 1973), *aff'd* 498 F.2d 1314 (8th Cir.1974); *Philadelphia Welfare Rights Organization v. O'Bannon,* 525 F.Supp. 1055, 1057 (E.D.Pa.1981). *See also Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981).

injunctive relief, entails consideration of the following factors:

a) the threat of irreparable harm to the movant;

b) the balance between this harm and the harm that would result to the defendants from granting the injunction; and

c) the public interest.

In the balance, no single factor is determinative. Rather, a court must determine whether the overall weight of these factors supports or opposes granting the sought injunctive relief. *Dataphase*, 640 F.2d at 113.

These factors were already discussed and evaluated in the May 5, 1983, order granting a preliminary injunction for the North Dakota class. 562 F.Supp. at 1359–60, 1366–67. Based on the evidence presented at the trial on the merits, the national scope of the FmHA regulations, and the stipulation entered by the parties that the North Dakota class is representative of the national class, the reasoning and conclusions as to this issue contained in the order granting the preliminary injunction are adopted by reference. *See id.*

The third step concerns what form the injunctive remedy should take. The form of relief in this case has been subject to substantial analysis and input by both parties. Motions for modification of the preliminary injunction have been briefed, argued, and resolved. No further delay is warranted or necessary.

Therefore, IT IS ORDERED

A. That the plaintiff class shall consist of:

"all persons who have obtained a farmer program loan from the Farmers Home Administration, and who are or may be eligible to obtain a farmer program loan from the Farmers Home Administration, and whose loans are or will be administered in the Farmers Home Administration offices located throughout the United States, but the national class does not include

1. borrowers who reside in states where a state-wide class action is requested (and not denied at a later time), or is already certified; or

2. borrowers who have presently filed actions that directly relate to the implementation of 7 U.S.C. § 1981a, the constitutionality of a pre-hearing cut-off of necessary family living and farm operating expenses, and the constitutionality of the Farmers Home Administration appeals procedure."

This Court presumes that all litigants who are presently before another court on the same issues have opted out; however, such litigants may request permission from their presiding court to enter the national class.

B. That the defendants, their agents, subordinates, and employees are enjoined from proceeding to liquidate, or to terminate the living and operating allowance previously determined in the administration of any existing loan unless:

1. the defendants shall give any plaintiff against whom defendants propose to proceed at least 30 days notice:

a. That informs the borrower of his right to an informal hearing to contest the liquidation or termination and to establish eligibility for loan deferral pursuant to 7 U.S.C. § 1981a;

b. That provides the borrower with a statement that gives the reasons for the proposed liquidation or termination;

c. That informs the borrower of the factors that determine eligibility for loan deferral; and

d. That informs the borrower of the official who would preside at the informal hearing. The official designated shall not have been actively involved in the initial decision of liquidation or termination.

2. The official presiding at any informal hearing shall present his decision in writing, giving his reasons therefore, which decision shall be furnished to the borrower.

C. That the defendants, their agents, subordinates, and employees, are enjoined from:

—Accelerating the indebtedness of the plaintiffs,

—Foreclosing on the real property or chattels of the plaintiffs,

—Demanding voluntary conveyance by the plaintiffs, or

—Repossessing chattels of the plaintiffs or in any way proceeding against or depriving the plaintiffs of property in which the defendants have a security interest,

unless:

1. defendants shall give any plaintiffs against whom the defendants propose to proceed at least 30 days notice:

a. That informs the borrower of his right to a hearing to contest the proposed action and to establish eligibility for loan deferral pursuant to 7 U.S.C. § 1981a;

b. That provides the borrower with a statement that gives the reasons for the proposed action;

c. That informs the borrower of the factors that determine eligibility for loan deferral;

d. That informs the borrower of the official who would preside at the hearing. The official designated shall not have been actively involved in the initial decision to take the proposed action.

2. The official presiding at any such hearing shall present his decision in writing, giving his reasons therefore, which decision shall be furnished to the borrower.

D. Before moving for judgment of foreclosure in existing actions by FmHA, the defendants shall comply with section C above.

E. Nothing in this order shall prevent the *bona fide* "graduation" of a plaintiff into traditional loan services pursuant to the applicable statutes and regulations.[57]

This injunction is subject to the following limitations:

1. Where the borrower has totally abandoned any secured property and that property is at substantial risk of irreparable injury, defendants may take the necessary steps to protect the secured property; however, once the necessary steps have been taken to protect the property, or where there is abandonment of the property and no substantial risk of irreparable injury, defendants shall comply with the requirements of this injunction.

2. Defendants may proceed with foreclosure where the borrower knowingly and voluntarily consents to foreclosure in writing. However, where a borrower consents to foreclosure following the termination or substantial reduction of family living or farm operating expenses, the FmHA must establish, in any subsequent proceeding contesting the foreclosure, that the borrower's decision to allow foreclosure was voluntarily made, not coerced by the termination or reduction of living and operating expenses, and made with full knowledge of his rights, including the right to appeal the decision concerning living and operating expenses and to request deferral under 7 U.S.C. § 1981a.

3. Where a borrower is found guilty of conversion, defendants may immediately terminate family living and farm operating expenses, take the necessary steps to protect the property, and initiate foreclosure proceedings; nonetheless, such a borrower must still be afforded an opportunity to apply for deferral under 7 U.S.C. § 1981a.

4. This injunction shall not apply to situations where a) the borrower initiates Chapter 7 bankruptcy and the trustee in bankruptcy abandons the property to the

---

**57.** *See, e.g.,* 7 C.F.R. § 1843.30 (1983); 7 C.F.R. § 1951.261 (initially published at 48 Fed.Reg. 40,204–07 (1983)). *But see* 7 C.F.R. § 1980.147 (subpart B, farmer program loans, "no graduation requirement for guaranteed loans"), § 1980.290 (subpart C, "no 'graduation' requirement for [emergency livestock] loans"), and § 1980.589 (subpart F, economic emergency loans, "*no* 'graduation' requirement for guaranteed loans").

United States or to another lienholder who commences foreclosure; and b) the borrower is discharged in bankruptcy. IT IS FURTHER ORDERED that defendants John R. Block and Charles W. Shuman shall give notice to their agents, subordinates, and employees who are charged with implementing FmHA loans, of the contents of this order.

Plaintiffs have moved for attorneys fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412. Both parties briefed the issue of eligibility for such an award under 28 U.S.C. §§ 2412(b), or, alternatively, 2412(d)(1)(A). The parties based their briefing on the status of the suit as of July and August, 1983. Now that the suit has come to a conclusion, the Court deems it appropriate to give the parties an opportunity to make additional arguments, should they so desire. Therefore, IT IS ORDERED that plaintiffs have twenty (20) days from the date of this order to brief the issue and to submit their bill of costs and fees. Defendants have ten (10) days from the date of receipt of plaintiffs' brief and bill to respond to both.