UNITED STATES of America,
Plaintiff-Appellee,

v.

Daniel O. THOMPSON, III,
Defendant-Appellant.

No. 83–1409
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1984.

Odell, Anderson & Whitehill, Barry K. Odell, Austin, Tex., for defendant-appellant.

Edward C. Prado, U.S. Atty., Jack B. Moynihan, Asst. U.S. Atty., San Antonio, Tex., M. Clara Garcia, Atty., Washington, D.C., for plaintiff-appellee.

Before THORNBERRY, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this suit, the United States sought to recover over $15,000 in incentive salary bonuses it had paid to Daniel Thompson, a doctor formerly employed by the National Health Service, because Thompson resigned from his position before the end of the period for which he had agreed to serve. Thompson argued that he was entitled to keep the salary bonuses because his resignation had been involuntary. The district court granted summary judgment for the government, and Thompson appeals that judgment. Because the record shows without contradiction that Thompson failed to pursue other avenues open to him short of resigning, we affirm the judgment of the district court.

I.

As in all appeals from cases decided by summary judgment, we view the evidence in the light most favorable to the party opposed to summary judgment. Viewed in Thompson's favor, we briefly summarize the occurrences which led to this lawsuit.

In 1977, Thompson accepted a two-year commission from the National Health Service Corps (NHSC), a uniformed service created by the United States government to provide medical personnel for the staffs of federal and federally-aided medical and scientific agencies. Thompson's acceptance of the commission was conditioned upon his being selected to receive variable incentive pay.[1] Thompson was assigned to serve as a staff doctor at the Su Clinica Familiar, a rural community health clinic located in Raymondville, Texas, which is

---

1. The variable incentive pay program was established by Congress in order to encourage qualified medical personnel to accept positions in the Public Health Service, of which NHSC is a branch. The statute, since repealed, provided:
   (a) Under regulations prescribed by ... the Secretary of Health, Education, and Welfare, ... a medical officer of the Public Health Service, who ... [meets certain eligibility requirements and executes a written active duty agreement under which he will receive incentive pay for completing a specified number of years of continuous active duty subsequent to executing such an agreement; may, upon acceptance of the written agreement by the Secretary concerned, or his designee, and in addition to any other pay or allowances to which he is entitled, be paid an amount not to exceed $13,500 for each year of the active duty agreement. Upon acceptance of the agreement by the Secretary concerned, or his desig-

nee, and subject to subsections (b) and (c) of this section, the total amount payable may be paid in annual, semiannual, or monthly installments, or in a lump sum after completion of the period of active duty specified in the agreement, as prescribed by the Secretary concerned.

   ....

   (c) Under regulations prescribed by the Secretary of ... Health, Education, and Welfare, as appropriate, an officer who has received payment under this section and who voluntarily, or because of his misconduct, fails to complete the total number of years of active duty specified in the written agreement shall be required to refund the amount received that exceeds his entitlement under those regulations.
Act of May 6, 1974, § 1(4), 88 Stat. 95, repealed by Act of Dec. 12, 1980, § 414(a), 94 Stat. 2906.

primarily funded by the federal government and staffed by NHSC personnel. Thompson received an incentive payment of $12,500 at the beginning of both his first and second years at Su Clinica Familiar.

Thompson was aware that he would be assigned to Su Clinica Familiar before he accepted his NHSC commission. He interviewed both Dr. Fisch, the clinic's medical director, and the doctor whose position he filled before he accepted the job. They assured him during this interview that the nurses employed at the clinic were competent and that there had never been any legal trouble at the clinic due to the use of nurses in direct patient care. Because of the NHSC benefits, the clinic location and Thompson's favorable impression of the clinic based on this interview, he accepted the NHSC commission.

In his position as Associate Medical Director of Su Clinica Familiar, Thompson was to supervise the work of NHSC nurse practitioners and nurse midwives as well as to provide medical care directly to patients. After he began work, Thompson discovered that some of the clinic's "nurse practitioners" were in fact licensed vocational nurses. Two qualified nurse practitioners left the clinic and were replaced by one nurse practitioner trainee. In addition, the licensed pharmacist was on duty only two or three days per week, and in his absence his duties were performed by an unlicensed assistant. When Thompson expressed to Fisch his concern that the staff was not adequately trained, Fisch assured him that the clinic was actively seeking qualified staff members.

Thompson also became aware that the nurses at the clinic were performing duties which, in his opinion, included the diagnosis of illness and treatment of patients. The clinic's nurses frequently wrote prescriptions which were filled at the clinic pharmacy. Thompson reviewed and signed the prescriptions made by nurses once a week. Thompson questioned the legality of these procedures, but Fisch assured him that there were no legal problems at the clinic.

In 1978, Fisch told Thompson that the Texas Board of Medical Examiners (TBME) was investigating allegations that the clinic nurses were engaged in the unauthorized practice of medicine. However, Fisch told Thompson that TBME had approved changes in the clinic's procedures which would satisfy the board's concerns. Under the new procedures, Thompson was required to countersign all patient charts at the time the patient was seen by a clinic nurse, even if Thompson did not see the patient himself.

Thompson was concerned that the new procedure gave the false impression that he was providing supervision over the clinic nurses. In fact, the overwhelming number of patients treated at the clinic, as well as the number of patients treated by the nurses at locations outside the clinic, made it impossible for Thompson to oversee all the nurses' work. In an affidavit, Thompson later described the new procedure as "a rubber stamp operation." Thompson again was assured that the new procedures were legal when he questioned Fisch about them.

On the advice of his brother, a Texas attorney, Thompson requested that the clinic hire an additional staff doctor. Fisch promised him that he would try to recruit another doctor, but Thompson did not trust this promise. Thompson's brother advised him that if he continued to follow the clinic's policies, he might be in danger of losing his medical license on grounds that he was aiding in the unlicensed practice of medicine. Thompson became very concerned about this possibility, despite Fisch's continued assurances that the clinic's procedures were legal and that Thompson was in no danger of losing his license. Fisch told Thompson that the federal government would intervene on the clinic's behalf in any legal actions instigated by TBME. Thompson's brother advised Thompson to resign immediately.

In September 1978 Thompson accepted a new position in Austin, Texas. In his affidavit, Thompson explained the reasons for his resignation:

I came to realize that without my medical license to rubber stamp the activities of the nurses the clinic could not function. I had been vocal about my objections to the practices at the clinic. The other physicians had ostracized me. I had no alternative but to leave the clinic and the NHSC. I feared retaliation if I stayed in the NHSC. A transfer was unthinkable. I knew too much and had been too vocal.

. . . .

I worked for the NHSC at Su Clinica Familiar in Raymondville fifteen months out of my two-year contract. The only reason I left was for fear that my medical license would have been in jeopardy if I had stayed. I was upset, worried, and afraid. I would have stayed but for that. . . . My termination was not voluntary in any sense of the word and solely the result of the procedures at the clinic, which were wrongful by design. I had no choice but to participate in the wrongful procedures and perhaps be disciplined by the TBME, refuse to sign charts and prescriptions where I had not supervised the nurse and be fired or worse, or resign.

Thompson did not inform NHSC of the reasons for his resignation when he left Su Clinica Familiar. He did so, through his lawyer, after NHSC began its efforts to force Thompson to return a portion of the variable incentive pay benefits he had received in return for his promise to work for NHSC for two full years.

## II.

Even though Thompson did not perform services for the full bonus period for which he was paid, he refused to repay any of his incentive pay benefits, and the government filed this suit, seeking judgment for more than $15,000.[2] At the pre-trial conference, the district judge heard oral arguments regarding the government's motion for summary judgment, and he gave a brief oral statement of the reasons for his decision to grant that motion. The district court found that the government was entitled to recover a portion of the incentive payments made to Thompson because Thompson had resigned voluntarily.[3] The summary judgment proof before the district judge showed, in his opinion, that the government had not in any way coerced Thompson to resign.

In appealing the decision of the district court, Thompson has raised three issues. They are, first, whether the district court erred in denying Thompson's motions to strike a number of government exhibits; second, whether the government is equitably estopped from arguing that his resignation was voluntary because of the misconduct of NHSC personnel; and third, whether the district court erred in granting summary judgment for the government on the issue of voluntariness.

## III.

### A.

During the pendency of the government's motion for summary judgment, Thompson made three motions to strike portions of the government's summary judgment proof. The district court apparently made no express ruling on these motions, although it appears from the record that the government offered substitutes for some of the exhibits to which Thompson objected. Thompson argues, somewhat contradictorily, that these exhibits were irrelevant to the issues in this case, but that if they had been stricken, the government "would have had no support, inferential or otherwise, for its motion . . . other than the fact of Thompson's resignation . . . ."

---

2. The calculation of the amount of the award to the government, which was based on regulations requiring the return of a portion of incentive bonuses upon voluntary resignation, is not at issue in this appeal.

3. *See* note 1, *supra,* for citation to the statutory authority.

■ Our review of the district court's failure to grant Thompson's motions is hampered by the fact that Thompson does not state in his appellate brief the grounds on which he contends the various exhibits and affidavits were inadmissible. However, the district court record indicates that Thompson's objections focussed on the competence of certain affiants to testify regarding the possibility that Thompson could have obtained a transfer to another NHSC position had he attempted to do so. Some of Thompson's objections were cured by the substitution of new affidavits by the government. In addition, it appears from the record that Thompson's argument as a whole is without merit. The affidavits show that the government officials were testifying about programs that they personally administered, describing their own roles as supervisors as well as the routine practices and policies of their agencies, about which they had every reason to possess personal knowledge. This testimony was relevant evidence, and, certainly, it was given by competent witnesses. From the record and argument before us, we can ascertain no valid basis for Thompson's argument that the district court erred in failing to strike portions of the government's summary judgment proof. Moreover, the consideration of these affidavits by the district court, even if improper, was harmless.[4] As we shall discuss, Thompson failed to carry his burden of raising a triable issue of fact on the question of voluntariness. By his own admission, there were other alternatives, though perhaps unpleasant, open to him at the time he chose to resign. Thompson's affidavit suggests that he was aware that he could have *sought* a transfer to another NHSC position. *See* p. 192, *supra.* The officials' affidavits only confirm the existence of this option.

### B.

Thompson contends that the government is estopped from enforcing the statutes and regulations requiring him to refund his un-

earned incentive pay because of the misconduct of government officials at Su Clinica Familiar. His argument turns on two alleged instances of misrepresentation by Fisch: first, Thompson argues that he would not have accepted the NHSC commission if Fisch had told the truth about the clinic's legal troubles, and second, that he participated in the "cover-up" of the illegal practices because of Fisch's misrepresentations about their legality.

■ Even assuming that Fisch lied to Thompson about the legality of the clinic's new procedures, which Fisch said were approved by TBME, Thompson's second argument can easily be dismissed because it is clear that Thompson, who did not believe the statements, did not rely on them to his own detriment. Obviously, had Thompson believed Fisch and relied on his statements, he would not have resigned from his post. Therefore, with respect to his second argument, Thompson has failed to establish reliance, an essential element of his estoppel claim.

Thompson's first argument, that he accepted the NHSC commission because of Fisch's misrepresentations, is more plausible, but it, too, fails. We view this argument against a background of authority which counsels that estoppel is to be cautiously applied against the government. *See Portmann v. United States,* 674 F.2d 1155, 1158–67 (7th Cir.1982); *Gressley v. Califano,* 609 F.2d 1265, 1267 (7th Cir. 1979). Especially relevant is this court's decision in *Hicks v. Harris,* 606 F.2d 65 (5th Cir.1979). In *Hicks,* we reiterated the position, well-established in this circuit, that the government cannot be bound by unauthorized or incorrect statements of its agents. 606 F.2d at 69. Courts also have repeatedly held that when an individual seeks to enforce a statutory benefit to which he is not entitled by law, the government cannot be estopped from relying on the provisions of the statute by virtue of its employees' unauthorized misrepresentations. *Gressley v. Califano,* 609 F.2d at

---

**4.** *See, e.g., California Pacific Bank v. Small Busi-* *ness Administration,* 557 F.2d 218 (9th Cir.1977).

1267, (citing *Goldberg v. Weinberger*, 546 F.2d 477 (2d Cir.1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2468, 53 L.Ed.2d 255 (1977)). The *Goldberg* court held that "[e]ven detrimental reliance on misinformation from a seemingly authorized government agent will not excuse a failure to qualify for the benefits under the relevant statutes and regulations." 546 F.2d at 481.

■ The rules set forth in these cases squarely foreclose the application of the doctrine of equitable estoppel in this case. Thompson contends that he is entitled to retain the benefit of the variable incentive payments because he fulfilled his statutory and contractual obligations to NHSC. He seeks to estop the government from relying on the provisions of the statute in its argument that Thompson is not entitled to those benefits.[5] Even if Fisch intentionally lied to Thompson and intended thereby to induce Thompson to take the NHSC job, and we must assume, on this summary judgment, that he did, the government's right to enforce the provisions of the statute cannot be defeated by those unauthorized misrepresentations. Thompson's claim to the incentive payments that he received, therefore, must stand or fall on the merits of his final argument, that is, that his resignation was not voluntary.

### C.

We are not aware of any cases defining the term "voluntary" specifically as it was used in the now-repealed statute which created the variable incentive pay program. However, there is a fairly substantial body of federal jurisprudence which discusses claims of involuntary resignations, or constructive discharges, in comparable situations.[6] We look to these cases in evaluating Thompson's defense to this lawsuit.

■ In *Christie v. United States*, 518 F.2d 584, 207 Ct.Cl. 333 (1975), the Court of Claims reiterated its three-part test for

evaluating whether a government employee's seemingly voluntary resignation was in fact the product of government duress. In order to show duress, the employee must show "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." 518 F.2d at 587, (quoting *Leone v. United States*, 204 Ct.Cl. 334, 339 (1974)). *Christie* was decided on cross-motions for summary judgment. The Court of Claims case made it clear that the *employee* bears the burden of creating a fact issue with respect to his claim for duress. The court pointed out that there is a presumption that a seemingly voluntary resignation was, in fact, voluntary. 518 F.2d at 587. In order to survive a motion for summary judgment, the employee must tender *objective* evidence that the resignation was the product of duress. The *Christie* court held that "[d]uress is not measured by the employee's subjective evaluation of a situation. Rather, the test is an objective one." *Id.* This court has adopted the *Christie* test in similar situations. *See Coffman v. Bolger*, 590 F.2d 1366, 1368 (5th Cir.1979).

The Court of Claims in 1977 decided a case on which Thompson now relies. In *Roskos v. United States*, 549 F.2d 1386, 213 Ct.Cl. 34 (1977), the court held that an employee's resignation in the face of a wrongful transfer order was involuntary. The court stated, "An action is not voluntary if it is *produced by* government conduct which is wrongful." 549 F.2d at 1389–90 (citations omitted). The court's use of the words "produced by" clearly reflects the causative element of the *Christie* test: the employee must show by objective evidence that the government's action left him no other choice but to resign. The *Roskos* court found that the plaintiff, Roskos, was coerced into resigna-

---

5. Of course, the procedural posture of this case, in which the government is the plaintiff because it seeks to recoup payments already made to Thompson, is irrelevant to the merits of Thompson's estoppel argument.

6. These two terms appear to be used somewhat interchangeably in situations similar to the case at bar. Any distinction between the two terms seems irrelevant to our discussion.

tion. Roskos attempted to appeal his reassignment to another post and had expressed his belief that the transfer was wrongful, to no avail. The court in that case found that Roskos' seemingly voluntary resignation was in fact the product of duress.

■ Returning to the facts of this case, we find it immediately apparent that Thompson has failed to adduce any *objective* evidence tending to establish the second element of the *Christie* test. By his own admission, Thompson could have *sought* transfer to another NHSC position. Thompson's statement in an affidavit that seeking a transfer was "unthinkable," apparently because Thompson had been a vocal critic of the policies of Su Clinica Familiar, is no more than a statement of Thompson's *subjective* assessment of his situation. In fact, the record clearly reflects that Thompson could have sought a transfer to any of a number of divisions within the Public Health Service which do a wide variety of medical work, including the staffing of the Food and Drug Administration, the Centers for Disease Control and the National Institutes of Health, as well as the NHSC. Even more damning to Thompson's case, however, is the fact that he admittedly made no attempt at all to continue working at Su Clinica Familiar and to refuse to engage in the practices which he believed were illegal. In the words of the *Christie* court, Thompson had a choice. He could have chosen to "stand pat and fight. [He] chose not to." 518 F.2d at 587. It was this uncontroverted fact which persuaded the district court to grant summary judgment for the government. The district judge distinguished this case from *Roskos* on that ground:

> "[In *Roskos*] the man objected to his transfer and even appealed it. He made known his opposition before his resignation. Rather than accept what he felt was an unlawful transfer, he resigned. Here, [Thompson] has not made known his opposition to doing what Fish [sic] asked him to do .... He did not take the stand. He did not appeal from a

direct requirement of his employer to "do this or else."

This Government action doesn't prove coercive because [Thompson] walked off before the issue was ever made.

We find ourselves in complete agreement with the district court. Thompson has failed to present even the minimal proof necessary to survive summary judgment on his claim that his resignation was involuntary. Rather, Thompson chose to take what appeared to him to be the most desirable of several obvious alternatives. The second element of the *Christie* test has not been met.

### IV.

For the reasons set forth above, the judgment of the district court is

AFFIRMED.