UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence Wayne GARTH,
Defendant-Appellant.

No. 85–1126.

United States Court of Appeals,
Fifth Circuit.

Oct. 8, 1985.

John F. Arens, Richard P. Alexander, Fayetteville, Ark., for defendant-appellant.

Marvin Collins, U.S. Atty., Clinton E. Averitte, Asst. U.S. Atty., Lubbock, Tex., for plaintiff-appellee.

Before GOLDBERG, JOLLY and HIGGINBOTHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

Emerson once wrote that "[t]he farmer is covetous of his dollar, and with reason. It is no waif to him. He knows how many strokes of labor it represents. His bones ache with the day's work that earned it." [1] In the years since Emerson penned these words, air-conditioned combines have in most instances replaced horse and harness, but farmers, like any other workers in a troubled industry, remain covetous of their dollars.

In this case, the jury found in essence that appellant's covetousness of the dollar exceeded the bounds of the criminal law. In particular, the jury found appellant Lawrence Wayne Garth guilty of five counts [2] of conversion, in violation of 18 U.S.C. §§ 658 and 2.[3] All five counts alleged the conversion to his own use of property mortgaged to the Farmers Home Administration ("FmHA"). Count 1 charged Garth with the conversion of 10,000 cwt. of grain sorghum; Counts 2, 3, and 4 charged the conversion of 15, 8, and 98 head of cattle respectively; and Count 6 charged him with the conversion of 136 bushels of wheat. The district court sentenced Garth to two years in prison on each of the five counts, which sentences were to run concurrently.

Appellant raises five grounds of error: (1) that his conviction violates his constitu-

---

1. *Conduct of Life. Wealth.*

2. The original indictment contained six counts. On the government's own motion, the trial court dismissed Count Five.

3. 18 U.S.C. § 658 reads in pertinent part:
   Whoever, with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use or to that of another, any property mortgaged or pledged to, or held by ... the Secretary of Agriculture acting through the Farmers' Home Administration, ... shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the value of such property does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
   18 U.S.C. § 2 reads:
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

tional right to equal protection of the laws and due process; (2) that 18 U.S.C. § 658 is void for vagueness; (3) that the government had impliedly consented to his conduct and is therefore estopped from prosecuting him; (4) that the trial court erred in refusing to admit defendant's proffered exhibit 10; and (5) that the evidence at trial is insufficient to support his conviction. Finding all five arguments meritless, we affirm.

## I. *Factual and Procedural Background*

Wayne Garth is a farmer who raises cattle and hybrid seed on over 3,000 acres near Dumas in the Texas Panhandle. In 1978 the counties where Garth farmed were declared disaster areas due to drought. Saddled with losses from the drought and other debts, Garth applied to the FmHA for a $400,000 economic emergency loan in September, 1978. Charles Taylor, then FmHA county supervisor in Amarillo and a witness for the government at trial, recommended that Garth withdraw his application. Taylor had concluded that Garth's outstanding debts would limit his ability to repay the loan.

Garth then refiled in December, 1978 for emergency loans, which, after another assessment of his farming operations and his ability to pay, the FmHA approved for the sum of $1,650,640.00.[4]

The loan was evidenced by four promissory notes, all dated June 19, 1979. The first loan was in the amount of $95,130, payable over twenty years at three percent interest. This loan covered actual production losses from the drought. The second loan was for $169,520, payable over seven years at eight-and-one-half percent interest. This loan was a major adjustment emergency loan to restructure chattel-type debt. The third loan was also a major adjustment emergency loan, but it restructured real estate-type debt. It was for $873,090, payable over forty years at eight-and-one-half percent interest. The fourth loan was an annual operating loan for the purpose of financing Garth's projected operating expenses for 1979. It was for $512,900, payable in one year at eight-and-one-half percent interest. To pay for his 1980 operating expenses, FmHA loaned Garth $623,400 on June 19, 1980, payable in one year at fourteen percent interest. Apparently, Garth has paid in full only the loan for $512,900.

On June 19, 1979, Garth signed an agreement that secured all four notes and any future indebtedness to FmHA. The security agreement provided that Garth's crops, then or thereafter planted, and all livestock, then owned or thereafter acquired would secure the four notes and any future notes. No new security agreement was made for the 1980 loan of $623,400.

Garth's course of misconduct began on October 26, 1980, when he sold his seed milo crop to Advanced Quality Seed Company, of which he was a partner, without reporting to FmHA the sale or the disposition of the proceeds. Only after Weldon Rainey, who succeeded Taylor in supervis-

---

**4.** While it may at first seem odd that after being refused a $400,000 loan Garth then received a loan four times that size, the explanation lies in the difference between the economic emergency loan program and the emergency loan program. In the latter, FmHA has far greater flexibility to step in and restructure the farmer's debt to facilitate repayment.

Charles Taylor testified that the FmHA had the authority under the emergency loan program to do several things that were not possible under the economic program: "Number one, the maximum loan [limit] under Economic Emergency Loan was $400,000. Based on his outside other indebtedness, his total cash flow structure, if we had made him the $400,000 loan he still would have all his other substantial indebtedness due and he had limited repayment ability because some of them were past due, some of them were delinquent, some of them were coming due in the very near future. With using the Emergency Loan authorities we were able to make him a larger loan, a million six roughly, whereby we were able to come in and completely restructure the overall debt situation. By doing this and giving him extended repayment terms that he did not have the benefit of based on these other creditors we were able to show that he did have repayment ability. But only by our loaning these funds to refinance all these other creditors. We took him from a negative cash flow position to a positive cash flow position; something that he could show that he could live with." Tr. at 79.

ing Garth's account, had written to Garth on July 9 and July 17, 1981 about the crop did Garth bring in the settlement sheets for those sales. When Garth did not account for the milo proceeds, Rainey reported the conversion of the milo on August 4, 1981. The milo crop was valued at $100,184. These facts form the basis of Count 1.

The cattle sales that form the basis of Counts 2, 3, and 4 took place in February, March, and April of 1981. Mike Garth, Wayne Garth's son and a partner with his father in Garth and Garth Cattle Company, made the sales to and received the checks from the Texhoma Livestock Commission. Mike Garth sold 15 head of cattle on February 4 for $5,565.86, 8 head of cattle on March 5 for $2,302.13, and 98 head of cattle on April 30 for $23,501.79. Although Wayne Garth had accounted for the proceeds from many previous cattle sales, he did not turn over the proceeds from these sales, nor did he offer any explanation to Rainey when asked about them.

The last act for which the jury found Garth criminally responsible was the conversion of 136 bushels of wheat worth $493.68. Mike Garth sold 181.33 bushels of wheat to Moore County Grain Handling Company in Dumas, Texas, of which his share was 136 bushels. The check from the Grain Handling Company, although payable to Mike Garth, was deposited in Wayne Garth's account on July 13, 1981.

After Rainey had drawn up evidence of conversion, the Office of Inspector General, United States Department of Agriculture, sent special agent Allen Poff to investigate. On May 11, 1982, Poff interviewed Garth at his home regarding the milo, wheat, and cattle sales. Poff reduced the conversation to a written statement and returned on May 13, at which time Garth signed the statement. During the conversation, Garth admitted that he had sold the cattle which later formed the basis of Counts 2, 3, and 4, and that he had not given the proceeds to FmHA. Garth also admitted that he had not turned over to FmHA the proceeds from either the sale of the 1980 seed milo crop or the wheat sale to the Moore County Grain Handling Company.

Garth was indicted August 16, 1984, and trial began on December 7, 1984. The defense conducted its case through cross-examination of the government's witnesses, but it did not call any witnesses of its own. The jury returned guilty verdicts on all five counts on December 13, and on January 16, 1985, the trial judge denied defendant's motion for judgment of acquittal or, in the alternative, for a new trial. Garth was sentenced on February 22, 1985, and timely noticed his appeal that same day.

## II. *The Merits*

### A.

■ Garth asserts as his first point of error that, because he is a member of the Plaintiff class in *Coleman v. Block*, 580 F.Supp. 194 (D.N.D.1984), that decision bars the government from prosecuting him, and the trial court erred therefore in failing to dismiss the charges. *Coleman* held that FmHA appeal regulations governing foreclosures did not comport with due process, *id.* at 203, and enjoined the FmHA, among others, from foreclosing on secured property without adequate notice and hearing. *Id.* at 211.[5]

Although we can safely conclude that Garth is a member of the class thus protected, *see United States v. Nolder*, 749 F.2d 1128, 1130 (5th Cir.1984), we fail to see how his membership provides him any protection against a criminal prosecution under 18 U.S.C. § 658. *Coleman* does not speak in any manner, shape, or form—by any verb, noun, adverb, adjective, or otherwise—to indicate that it was dealing with any criminal statute. The relief sought and the issues considered were of a wholly civil nature. The only restriction that the court placed on the government in cases of criminal conversion was the requirement

5. For a dramatization of the problems *Coleman* sought to address, see *Country* (R. Pearce dir. 1984).

that the borrower "be afforded an opportunity to apply for deferral [of the loan] under 7 U.S.C. § 1981a." *Id.* at 211. This restriction in no way alters the class members' rights under the criminal law, but merely enjoins the government from ignoring class member rights under a distinct, civil law. In effect, Garth asks us to read *Coleman* as having decriminalized behavior prohibited by 18 U.S.C. § 658. *Coleman* did nothing of the sort, nor could it have done so.

### B.

The defendant next argues that the government is estopped from prosecuting him because FmHA officials had consented to his conduct. In support of this argument, Garth claims that the "evidence at trial established that it was a 'customary practice' to allow appellant and other FmHA borrowers to sell and dispose of crops and livestock and then report the same after the fact." Appellant's Brief at 20. Garth has also directed our attention to an audit report of FmHA practices by the office of the Inspector General of the Department of Agriculture.[6] The report, based on a sample of 202 cases nationwide, concluded that the "lack of legal action against known cases of improper dispositions contributes to the impression of implied consent held by many FmHA borrowers as well as the general public." Record Excerpts at 54.

This audit report is subject to the government's motion to strike, which we now grant for the following reasons. The report first appeared in the Defendant's Record Excerpts, well after trial. It was neither admitted nor even offered at trial. The defendant argues in effect that the report, rather than proving facts asserted, constitutes some sort of quasi-legal finding, which, although not binding on us, somehow compels us to agree with its conclusions. The short answer to this argument is that the defendant has used the report as a post hoc attempt to strengthen the record on the factual question of implied consent. Moreover, had defendant offered the report, the trial court would not have abused its discretion by excluding it. On the record before the court, the report was irrelevant to the acts of the FmHA officials in this case.

Thus, while the world according to Garth contains the audit report, we are constrained by the record, and the record does not support Garth's contention that the government consented to his conduct. What the record supports is the fact that the FmHA officials with whom Garth dealt expected that when a debtor disposed of secured property, the debtor would report the proceeds of the sale within a few days of the sale.[7] Garth, however, never reported the disposition of the proceeds from the sale of the converted property. There is absolutely no evidence in the record that the FmHA officials consented to this conduct. Moreover, Garth's on-again, off-again reporting of the proceeds belies any assertion that the government's consent fully shaped his behavior.

Garth then argues that even though he failed to report the disposition of the proceeds, he used those proceeds for necessary farm operating expenses, a practice that, he asserts, was authorized by his supervising officials. Once again, there is no evidence in the record to support this claim. Charles Taylor testified only that he allowed Garth to dispose of his 1978 seed milo crop in this way, on which the FmHA had no lien. Moreover, even had FmHA given its consent, there is no evidence that Garth used the proceeds solely for farm operating expenses.

---

6. Audit Report No. 04638–2–At, Record Excerpts, 50–55.

7. Charles Taylor testified that when a farmer sold his crops, the customary practice was for "him to report the proceeds of that sale within a reasonable period of time, like tomorrow or the next day or sometime within a few days. We don't mean for him to go out there and sell a secured piece of property today and then when he gets caught six months to a year later say, oh, now I want your permission to do that." Tr. at 124.

Finally, even assuming that the government had consented to Garth's use of unreported proceeds for farm operating expenses, that consent would not as a matter of law relieve Garth of his criminal liability. Like the Ninth Circuit, we "recognize the force of the proposition that estoppel should be applied against the Government with utmost caution and restraint.... Indeed the tendency against Government estoppel is particularly strong where the official's conduct involves questions of essentially legislative significance, as where he conveys a false impression of the laws of the country." *Schuster v. Commissioner of Internal Revenue,* 312 F.2d 311, 317 (1962); *see also, United States v. Thompson,* 749 F.2d 189, 193 (5th Cir.1984); *Hicks v. Harris,* 606 F.2d 65, 68–69 (5th Cir.1979); *cf., Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) ("anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority").

The Ninth Circuit has made estoppel available as a defense against the government "if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." *United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973). Although we find it inappropriate to adopt this test here, we would nonetheless have difficulty concluding that the public's interest would

not be unduly damaged by the imposition of estoppel. *Lazy FC Ranch* and the cases cited therein were civil matters in which the public's interest was far less than its interest here in enforcement of the criminal law.[8]

We do not decide that estoppel against the government is never appropriate in a criminal case. The facts constituting the basis of an estoppel claim may go, as in this case, to the question of defendant's intent to defraud the government, in which case the question is one for the trier of fact. We have found nothing in this record that would compel us to abandon our caution and restraint.[9]

Although it is apothegmatic, it is therapy to be reminded once in a while that we are a government of laws and not of persons. It is neither aphoristic nor platitudinous to say that this doctrine courses through the whole panoply of our constitutional structure. The concept is basic to the ideals of ordered liberty and the protection of the rights of people that formed the bedrock of our founding document and its basic amendments. This case is a prime illustration that no man or woman, however powerful he or she may be, can by fiat rewrite the law that arises from our legislative process and is guarded over and construed by our courts.

## C.

In his third argument, Garth alleges that 18 U.S.C. § 658 is void for vagueness.[10] "To pass constitutional muster, a

---

**8.** As the government remarked in its closing argument, "You got to trust people. And when they violate that trust they need to be prosecuted, because I tell you, you sit here throughout this whole trial and you look around and you don't see any victims sitting in here, you see the government. Now, isn't that a great victim. About like an insurance company. You see the government. Well, I will tell you who the government is and who is the victim of this crime. It is every honest farmer who tries to do the program right, who tries to take the money and get back on his feet where he can get financing at a bank...." Tr. at 487.

**9.** We are not the first. In *United States v. Lott,* 751 F.2d 717 (4th Cir.1985), the defendant Lott

received an advance of $50,000 for the sale of cotton that was pledged as security for a loan from the FmHA. He claimed that the FmHA had implicitly agreed to let him keep the $50,000 and for that reason could not claim that he had converted the property. The court disagreed, noting that "even if the F[m]HA did lead Lott to believe that it knew of the advance and implicitly acquiesced in his retaining the funds, this in no way absolved him of the crime of conversion." *Id.* at 719.

**10.** We note as a preliminary matter that Garth neither raised nor addressed this issue below. "Generally, we do not consider issues that were not raised before the district court unless our

statute must give persons of ordinary intelligence fair notice that their contemplated conduct is forbidden by statute." *United States v. Greene,* 697 F.2d 1229 (5th Cir. 1983). Garth argues first that the statute does not provide notice as to whom it is impermissible to defraud. We disagree. The statute under consideration has a positive pellucidity. It is capable of neither misunderstanding nor miscomprehension. Anyone with a nominal level of intelligence can understand the impact of the statute.

■ We have no difficulty concluding that the statute gave Garth more than fair notice that the sale of the collateral for his loans from the FmHA and the subsequent conversion of the proceeds to his own use would place him in violation of the statute. Moreover, the clear intent of the statute is to protect from fraud the various government agencies listed, of which the FmHA is one.

■ Garth also makes several other arguments under the rubric of his vagueness analysis. First, he claims that the statute does not "address the issue of whether *permission* to conceal, remove, dispose of or convert is a factor in determining whether a violation of section 658 occurred." Appellant's Brief at 28. The statement of this question provides its own answer. Statutes prohibiting murder are not void for vagueness merely because they fail to state that the murder victim's permission does not excuse the crime. In addition, this claim merely restates his estoppel argument, which we have already rejected.

■ Second, Garth claims that the vagueness of the statute permits officials untrammelled discretion in deciding whom to prosecute, which in turn leads to arbitrary and discriminatory enforcement. We note first that this attack is not directed against

the statute itself, but is rather directed against its administration. To make out a claim of selective prosecution, which is what this argument amounts to, Garth must first "make a *prima facie* showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not." *United States v. Greene,* 697 F.2d 1229, 1234 (5th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). Garth has failed to meet this burden; there is no evidence in the record that he was either singled out or that others had committed the same acts. Even had he made such a showing, he would have stumbled on the second step of the claim, which requires a showing that the "prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.* No such showing has been made.[11]

### D.

■ Garth also complains that the district court erred in refusing to admit Defendant's proffered Exhibit 10, which consisted of documents that would have helped show that his 1979 operating loan had been paid in full. The district court sustained the government's objection on the ground that the defendant had failed to lay the proper foundation for the exhibit by failing to show that the witness had any familiarity with the documents. We find that the district court did not abuse its discretion in refusing to admit the exhibit. Garth finds the exhibit relevant because it would provide the factual predicate for his argument that payment of the loan extinguished any security interest the government had in his

failure to do so would result in grave injustice, or unless the issue can be resolved as a matter of law or is otherwise beyond dispute." *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1117 n. 20 (5th Cir.1985). Because the issue of the statute's vagueness is a matter of law, we address it here.

**11.** While his conviction will prevent him from farming for two years, farming is not a constitu-

tional right nor are farmers a suspect class. *But hear,* W. Jennings & W. Nelson, "Mamas Don't Let Your Babies Grow Up To Be Cowboys," on *Waylon and Willie* side 1, track 1 (1978) (noting that "Cowboys ain't easy to love, and they're harder to hold. They'd rather give you a song than diamonds or gold.").

crops and livestock. Because Garth was proceeding on an incorrect legal assumption,[12] it was irrelevant whether or not the loan had been paid off. The refusal of the district court to admit it is therefore at worst harmless error.

### E.

In reviewing the sufficiency of the evidence to support a criminal conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Lerma,* 657 F.2d 786, 789 (5th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982). All of the evidence must be considered in the light most favorable to the government, *Jackson v. Virginia, supra,* and we must accept all credibility judgments and reasonable inferences that support the verdict. *United States v. Dean,* 666 F.2d 174, 177 (5th Cir.), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). In addition, we note that "[t]he standard for review of the sufficiency of the evidence to support the conviction is the same whether the evidence is direct or circumstantial." *United States v. Hilburn,* 625 F.2d 1177, 1180 (5th Cir.1980) (citing *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954)).

▇▇ In order to obtain a conviction under 18 U.S.C. § 658, the government must prove three things: first, that Garth knowingly and wilfully disposed of, or converted to his own use, the property described in the indictment; second, that the property disposed of was mortgaged to the Farmer's Home Administration; and third, that Garth acted with intent to defraud the FmHA. We have no difficulty concluding that the government successfully carried its burden of proof.

To dispose of an issue common to all five counts, we address first Garth's contention that the property disposed of was not mortgaged to the FmHA. Garth claims that his crops and livestock secured only the 1979 operating loan for $512,900, and that by paying off this loan in full, he extinguished any security interest the FmHA had in the property that formed the basis of the indictment. He bases this belief on a letter dated March 15, 1979, from W.H. Pieratt, the FmHA State Director, in which Pieratt lists crops and cattle as security for the operating loan only. Defendant's Exhibit 5(a).

▇▇ Were this letter the only evidence of a security agreement, we might be inclined to agree with Garth. However, on June 19, 1979, Garth signed a document with the heading "Security Agreement (Chattels and Crops)." Government's Exhibit 5. The agreement secured all four promissory notes signed that same day, as well as future additional indebtedness, which would include the 1980 operating loan for $623,000.[13] As security, Garth pledged all crops, then or thereafter planted,[14] and all livestock, then owned or there-

---

**12.** *See* p. 1477, *infra.*

**13.** Relying upon 7 C.F.R. § 1941.57(d)(2)(i), Garth contends that the FmHA regulations required a new security agreement for new loans subsequent to the payment in full of a prior loan. We reject this argument because (d)(2)(i) applies only to initial loans, not subsequent loans. Had he read further, he would have encountered language that does appear to require a new security agreement for subsequent loans if the prior agreement was executed more than one year after "the crops which are offered as security became growing crops." 7 C.F.R. § 1941.57(d)(2)(ii)(B). Although the record is not clear on the point, both the 1980 seed milo

crop and the 136 bushels of wheat may not have been growing one year from June 19, 1979. Nevertheless, these crops were still pledged as security for the other three long-term loans. Garth has pointed to nothing in the regulations, nor have we found anything, that would create the administrative nightmare involved in drawing up new security agreements every year for outstanding loans.

**14.** The security agreement pledged as security "[a]ll crops, annual and perennial, and other plant products now planted, growing or grown, or which are hereafter planted or otherwise become growing crops or other plant products (a) within the one-year period or any longer

after acquired.[15] The record therefore supports the finding that the property cited in the indictment was mortgaged to the FmHA.

### Count One

■ Count One involved 10,000 cwt. of seed milo. The evidence at trial showed that Garth was a partner with J.L. Ervin, Jr. in Advance Quality Seed and Grain, Inc., and that on October 26, 1980, Garth began to deliver to Advance Quality Seed a portion of his 1980 seed milo crop. Garth received payment for the milo by making withdrawals from Advance Quality Seed's account. He continued to make withdrawals during 1981 until he had received full payment. Garth deposited most of the checks representing payment for the milo into his personal account at the First National Bank of Dumas. Only after Weldon Rainey, the county supervisor, had written Garth twice inquiring about the milo crop did Garth bring him the Advance Quality Seed settlement sheets. Rainey testified that Garth did not respond to his inquiry as to where the proceeds from the sale of the milo were. Special Agent Poff testified that Garth had told him that he had sold the milo and had not given the proceeds to the FmHA. The evidence also showed that during this period, Garth had been reporting the disposition of his other secured property. We think the evidence is sufficient to convince a rational trier of fact that Garth converted mortgaged property with intent to defraud the FmHA.

### Counts Two, Three, and Four

The evidence supporting these counts shows that Mike Garth, Wayne Garth's son and partner in Garth and Garth Cattle Company, sold a total of 121 head of cattle to the Texhoma Livestock Commission Company, Inc., on February 5, March 5, and April 30, 1981. Mike Garth deposited checks, payable to him, in the amount of $5,565.86, $2,302.13, $7,554.54, and $15,947.25, for the sale of 15, 8, 31, and 67 head, respectively, into the Garth Cattle and Farming account at Amarillo National Bank. The Garth Cattle and Farming account was in the names of Mike Garth and his wife, Mary Lynn Garth. Mike Garth deposited $23,501.79 for the sale of 98 head on May 1, 1981, and on the same day wrote a check for $17,000, payable to Wayne Garth. Another withdrawal from the account on the same date was in the amount of $4,094.36 with the notation that it was for principal and interest on a note. On May 11, 1981, there was a withdrawal in the amount of $1,948.96 from the account for interest on a note issued to Wayne Garth.

Weldon Rainey testified that he met Garth on September 3, 1981, after following up on reported sales to Redd Cattle Company and discovering previously unreported sales to Texhoma Livestock Commission. Garth furnished him with the settlement sheets from the sales to Texhoma, but offered no explanation to account for the disposition of the sales' proceeds. Special Agent Poff testified that Garth stated that he had not turned over to the FmHA the proceeds from these sales of FmHA mortgaged cattle to the Texhoma Livestock Commission.

■ Garth argues that all this evidence points to his son having made the sales and that there is no evidence to support a finding that he himself was involved in the sales. Garth, however, was indicted under 18 U.S.C. § 2, which holds those who aid or abet the commission of offenses against the United States punishable as principals.[16] From the evidence presented, we conclude that a rational trier of fact could have decided that Garth participated in the sales, that the cattle sold were mortgaged

period of years permissible under State law, or (b) any time hereafter if no fixed maximum period is prescribed by State law...."

**15.** The security agreement pledged as security "[a]ll livestock (except livestock and poultry kept primarily for subsistence purposes) ...,

now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto...."

**16.** *See* note 3 *supra*.

to the FmHA, and that Garth intended to defraud the FmHA.

### Count Six

The evidence, set out earlier, provides more than an ample basis to support Garth's conviction. In addition, Special Agent Poff testified that Garth admitted that he did not send to the FmHA the proceeds of this sale to Moore County Grain Handling Company.

### F.

Garth's final argument, and one that applies to all five counts, is that the evidence does not sufficiently corroborate his admissions to Poff and Rainey for the admissions to be admissible. The general rule is that "an accused may not be convicted on his own uncorroborated confession." *Smith v. United States,* 348 U.S. 147, 152, 75 S.Ct. 194, 197, 99 L.Ed. 192 (1954), and it is applicable where "the admission is made after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embraces an element vital to the Government's case." *Id.* at 155, 75 S.Ct. at 198. The corroborative evidence alone need not prove the defendant's guilt beyond a reasonable doubt, nor even by a preponderance, "as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that the defendant is guilty." *Id.* at 156, 75 S.Ct. at 199. "[A]lthough 'corroboration is necessary for all elements of the offense established by admissions alone,' extrinsic proof [is] sufficient which 'merely fortifies the truth of the confession, without independently establishing the crime charged * * *.'" *Wong Sun v. United States,* 371 U.S. 471, 489, 83 S.Ct. 407, 418, 9 L.Ed.2d 441 (quoting *Smith v. United States,* 348 U.S. at 156, 75 S.Ct. at 199.).

Armed with this test, we have no doubt that the record contains independent evidence that adequately corroborates the truth of Garth's admissions. Counts One and Six are not even close calls; the independent evidence alone would support his conviction. The independent evidence in Counts Two through Four, however, standing alone, would have been insufficient. This evidence showed only that father and son were partners, that the cattle were purchased by either Wayne or Mike Garth, that the cattle were sold by Mike Garth, and that proceeds from the sales probably found their way into Wayne Garth's personal account. Nonetheless, the evidence is strong enough to fortify the truth of the confession, which is all that is required.

### III. *Conclusion*

Although we sympathize with the plight of those American farmers who toil under an often crushing burden of debt, we cannot permit this sympathy to condone breaches of the criminal law. While we might like to make a contribution to Farm Aid, we cannot do so here. Finding no reversible error, we affirm Garth's conviction on all counts.

AFFIRMED.