UNITED STATES of America, Appellee,

v.

Marvin J. PORTER, Appellant.

No. 87-1148.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1987.
Decided March 28, 1988.

Fred L. Slough, Kansas City, Mo., for appellant.

Thomas M. Larson, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, HENLEY, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

Marvin J. Porter appeals from a district court[1] judgment entered on a jury verdict convicting him of knowingly concealing a mortgaged 2–135 White diesel tractor with intent to defraud the Green Hills Production Credit Association (PCA) in violation of 18 U.S.C. § 658.[2] Porter challenges (I) the sufficiency of the evidence; (II) the introduction of expert testimony on the ultimate issue of his sanity; and (III) the jury instructions. We affirm.

Porter was a young farmer who with his parents, doing business as R & M Porter Farms, Inc., conducted a feeder pig operation and raised corn, soybeans, and wheat on some five hundred acres near Kidder, Missouri. In the early fall of 1979, a representative of the PCA visited the farm to solicit the Porters' loan business. In January 1980, R & M Porter Farms, Inc. received a $200,076 annual operating loan. The Porters' income in 1980, however, was insufficient to repay the loan. The crops had failed due to drought, hog prices were depressed, and interest rates had skyrocketed. The next year, the PCA renewed the loan for $332,000, but at the end of 1981 the Porters again could not meet their obligation on the loan. In January 1982, as a condition of continued financing, the PCA demanded that the Porters advertise their land for sale, sell their farm equipment, and seek financing from another source to refinance the balance of their PCA debt. Porter's father protested that "we didn't start farming to liquidate," but ultimately agreed. A renewal note was executed for $441,000.

In December 1982, the PCA required that checks for R & M Porter Farms, Inc. hog sales be made out jointly to R & M Porter Farms, Inc. and the PCA and that all proceeds go directly to the PCA. To circumvent this requirement, Porter began selling hogs in his wife's maiden name. During this time, Porter began attending meetings with other farmers trying to find solutions to their financial crises. He met people who believed that the banking system was on the verge of collapse because Federal Reserve Notes are not backed by gold or silver and thus have no value, and that international bankers were conspiring to take land away from the farmers. Porter and his wife declared themselves "free sovereigns" and rejected state-created contracts such as marriage licenses, drivers' licenses, and social security numbers.

The PCA foreclosed on Porter's farm in January 1984 and replevined the farm equipment in June 1984. A 2–135 White diesel tractor listed in the security agreement was not found. After the foreclosure process, a balance of $290,000 was still owing to the PCA. Porter was charged in a twenty-one count indictment filed March 10, 1986. Count one charged Porter, his wife and his father with conspiracy to violate 18 U.S.C. § 658 in violation of 18 U.S.C. § 371. Counts two through twenty charged them with fraudulent conversion of mortgaged hogs, and count twenty-one charged Porter alone with knowingly concealing a 2–135 White diesel tractor with intent to defraud the Green Hills Production Credit Association in violation of 18 U.S.C. § 658. The charges against Porter's father were dismissed prior to trial.

The jury found Porter guilty of concealing the mortgaged tractor. The jury could not reach a verdict on counts one through twenty, however, and a mistrial was declared on those counts. Prior to sentencing, Porter entered a plea of nolo contendere on count twenty, charging fraudulent

---

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

2. 18 U.S.C. § 658 provides: "Whoever, with intent to defraud, knowingly conceals * * * any property mortgaged or pledged to * * * any production credit association * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both."

conversion of mortgaged hogs. In exchange, the government dismissed the entire indictment against Porter's wife. The district court sentenced Porter to eight months' imprisonment on count twenty and fifteen months' imprisonment on count twenty-one. After Porter had been confined for four months, the court reduced his sentence to time served and placed him on probation for three years.

## I.

Porter first maintains that there was insufficient evidence to convict him of concealing the tractor. He argues that concealment must involve some overt physical act, as opposed to mere oral deception, and that the government did not prove that he had physically secreted the tractor. The government responds that Porter's definition of concealment is too restrictive and that the evidence, although not overwhelming, was sufficient.

The evidence showed that the 2–135 White diesel tractor was listed on the security agreement executed in connection with Porter's loan from the PCA. Vance Hefley, the Porters' loan officer at PCA, testified that he had personally inspected the tractor. The Porters listed the tractor as an asset when they filed a bankruptcy petition in 1983. Hefley saw the tractor on Porter's farm in May 1984, but a month later, when the PCA repossessed secured equipment, the tractor was gone. There was no evidence, however, that any search for the tractor was conducted or that the PCA had exercised its right to request Porter to assemble his machinery prior to the replevin action. Although Porter took the stand at trial, he did not testify about the tractor, and the court prohibited cross-examination on the subject as beyond the scope of direct examination.

Bruce Strauss, an attorney who represented the PCA in other litigation with the Porters, testified that he had deposed Porter and had specifically asked him about the location of the tractor. Porter had answered that he did not currently know or remember where it was. The prosecutor asked Strauss if he had requested Porter to explain his answer:

Q (By the Assistant U.S. Attorney) Now, was there a point where you asked for an explanation of the phrase that was used "I don't currently know?"

A Yes.

Q How did Mr. Porter explain that phrase?

A He said that meant that he could know in five minutes, I think three weeks or three months, something like that, that he had ability to find out.

Q Did he admit to you that he was avoiding answering questions during this deposition?

A Yes. I explained to him that there were certain possible ramifications for not answering them and asked if he wanted to answer them, and I finally directly asked him, in fact, are you just avoiding my questions at this point and he stated yes.

In response to Porter's motion for judgment of acquittal, the district court ruled that although "the mere failure to find the tractor on Porter's farm would probably not support an inference of concealment by itself, Porter's refusal to tell PCA attorney Strauss where the tractor was located during a deposition would support such an inference." Mem.op. at 8.

It appears that no court of appeals has specifically considered whether proof of concealment under 18 U.S.C. § 658 requires evidence that the mortgaged property was physically secreted, and the parties disagree on what cases and statutes are analogous. Porter relies on *United States v. Casey*, 540 F.2d 811 (5th Cir.1976), which discusses the offense of knowingly receiving and concealing stolen motor vehicles in violation of 18 U.S.C. § 2313. In *Casey*, the only evidence of concealment was that the defendant had lied to a police officer concerning how he had obtained the vehicle. The Fifth Circuit held that a mere verbal denial that one has stolen a car, without evidence of an overt act, does not constitute sufficient evidence to convict.

*Id.* at 815–16. *But cf. United States v. Bonnetts,* 747 F.2d 1159, 1164 (7th Cir. 1984) (finding that defendant's acquiescence to having his license plates placed on stolen car sufficient to establish concealment, even though defendant did not perform physical act himself), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1771, 84 L.Ed.2d 831 (1985).

The government relies on *United States v. Joyner,* 539 F.2d 1162 (8th Cir.), *cert. denied,* 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed. 2d 593 (1976), and *United States v. Turner,* 725 F.2d 1154 (8th Cir.1984). In *Joyner,* the defendant was convicted of knowingly concealing property mortgaged to the Small Business Administration (SBA) in violation of 15 U.S.C. § 645(c). The defendant had sequestered the property and deceived the SBA through misleading and contradictory statements that had prevented the SBA from locating the property. We found the proof wholly sufficient to sustain the defendant's conviction. *United States v. Joyner,* 539 F.2d at 1165. In *Turner,* the defendant was convicted of concealing property with intent to defeat the bankruptcy laws in violation of 18 U.S. C. § 152 and challenged the district court's jury instructions on the definition of concealment. We concluded that "[c]learly concealment means more than 'secreting'; one does not have to put something in a hidden compartment, a safe, or a hole in the backyard in order to 'conceal' it. It is enough that one 'withholds knowledge,' or 'prevents disclosure or recognition.'" *United States v. Turner,* 725 F.2d at 1157. The defendant's failure to account for the bankrupt corporation's property amounted to concealing it. *Id.*

On appeal, we must consider the evidence in the light most favorable to the verdict, giving the government the benefit of all reasonable inferences that can be drawn from the evidence. *United States v. Maull,* 806 F.2d 1340, 1342 (8th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987).

We find *Joyner* and *Turner* dispositive. Porter gave evasive answers during the deposition when specifically asked to disclose the tractor's location, stating that he did not currently know of its location but that he could know in five minutes or three weeks or three months and that he had the ability to find out. He admitted that he was avoiding answering the questions. We hold that this testimony, coupled with the pattern of events that included the disappearance of the tractor shortly before the replevin order was executed and the fact that Porter had not returned the tractor to the PCA at the time of the trial, gave rise to a reasonable inference that Porter concealed the tractor.

## II.

Porter next argues that the district court erred in permitting expert testimony on the ultimate issue of his sanity in violation of Fed.R.Evid. 704(b), which states:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Porter filed a pretrial notice of intention to rely on an insanity defense. Accordingly, the government called Dr. Michael Burgess, a psychologist from Kansas City, to testify concerning Porter's mental condition. Dr. Burgess had interviewed Porter and had conducted intelligence and psychological tests. He testified that although Porter was argumentative, guarded, and exhibited a pervasive and unwarranted suspiciousness of people, which are symptoms of a paranoid personality and agitated depression, he also found Porter to be highly intelligent. Dr. Burgess concluded that Porter's mental condition had not affected his thinking and concentration.

Porter called three expert witnesses in his defense. Joanne Mermelstein, a Ph.D. candidate in rural sociology, and Dr. Val Farmer, a clinical psychologist and writer from South Dakota, both testified about the unique nature of chronic prolonged stress on the family farmer in the process

of losing his farm. Dr. Judy Moore, who had actually interviewed and tested the Porters, agreed with Dr. Burgess that Porter had a paranoid personality disorder and agitated depression. She concluded, however, that a person of any intelligence could suffer impaired thinking and that Porter's thinking had been affected in that he refused to accept the failure of his farm, was designing a reality of his own, and strongly believed that there was a conspiracy against him.

Dr. Moore gave the following testimony during direct examination:

[By Ms. Connealy]

Q. Now, you have described certain disorders, and I think it is important for the jury to know this, can these disorders and the mental conditions that you have described the Porters as having, are they of such a nature that they could substantially impair a person's thinking process?

[By Dr. Moore]

A. Yes.

Q. Could they substantially impair an ability to recognize right from wrong?

A. Yes.

Q. Can they substantially impair the ability to perceive consequences of conduct?

A. Yes.

Q. Would you tell me whether or not, in your opinion, in 1983, when these hog sales were alleged to have occurred, Marvin and Teresa Porter were suffering from substantially impaired conditions?

A. Yes.

During the government's cross-examination of Dr. Moore, the prosecutor asked her if she agreed with Dr. Burgess' written report, which had not been offered into evidence, that concluded that Porter was not insane, that he could distinguish right from wrong, and that his thinking capacity was not diminished. The trial court overruled Porter's objection, whereupon Dr. Moore stated that she disagreed with Dr. Burgess' conclusion that Porter could distinguish right from wrong, but agreed that he was not insane or psychotic.

■ Although Dr. Moore's opinion that Porter could not distinguish right from wrong addressed the issue of Porter's sanity as the defense is now codified, *see* Comprehensive Crime Control Act of 1984, 18 U.S.C. § 20(a) (Supp. II 1984), the testimony focused on the alleged hog sales in 1983, and not the concealment of the tractor in June 1984. Furthermore, the government correctly notes that Porter's counsel was the first to inquire about Porter's ability to distinguish right from wrong during direct examination of Dr. Moore. We agree with the trial court that it was permissible for the government to elicit Dr. Moore's opinion with respect to Dr. Burgess' conclusions regarding Porter's mental condition in view of the questions asked of Dr. Moore on direct examination.

■ Moreover, even if it were held that the trial court erred in so ruling, Porter was not prejudiced by the challenged testimony. The purpose of Rule 704(b) is to eliminate " 'the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact.' " *United States v. Cox*, 826 F.2d 1518, 1524 (6th Cir.1987) (*quoting* S.Rep. No. 225, 98th Cong., 2d Sess. 230, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3412), *cert. denied,* —— U.S. ——, 108 S.Ct. 756, 98 L.Ed.2d 768 (1988). Here, both the government's expert witness and the defendant's expert witness concluded that Porter was not insane.

### III.

Porter's final claim of error concerns certain jury instructions. The court instructed the jury that "property is mortgaged if the debtor signed a security agreement describing the collateral." Porter argues that the district court erred in rejecting his proposed instructions on defenses to the mortgage, including fraudulent inducement, negligent misrepresentation, mistake and constructive fraud. Porter contends that the purpose of the PCA is to provide sound, adequate, and constructive credit to farmers. The PCA officers hold them-

selves out as experts in agriculture financing, and farmers justifiably rely on them. The cash flow projections for Porter's farm, however, were inaccurate, overstating income and omitting expenses. Porter argues that by failing to give his proposed instructions, the court took the issue of the validity of the mortgage away from the jury. He asserts that he was convicted without due process of law and in violation of his sixth amendment right to a jury trial on all the issues.

■ Porter cites no cases to support the proposition that inaccurate cash flow projections constitute fraud or mistake that can invalidate a mortgage. Furthermore, the district court correctly noted that Porter never sought to rescind his loan agreement with the PCA. Porter's alleged defenses to the mortgage would render the security agreement voidable, but not automatically void. Thus, the court did not err in refusing the proposed instructions.

■ Porter also objects to the instructions on the ground that they failed to include as an element that he knowingly did an act which the law forbids and that he acted with a purpose to violate the law. Porter relies on *United States v. Marvin,* 687 F.2d 1221 (8th Cir.1982), in which we held that to convict a defendant for food stamp fraud under 7 U.S.C. § 2024(b), the government must prove that the defendant knew that his actions were in violation of the law. *Id.* at 1227. Section 2024(b) provides that "whoever knowingly uses, transfers, acquires, alters or possesses [food] coupons * * * *in any manner not authorized by this chapter"* shall be liable. 7 U.S.C. § 2024(b) (emphasis added). We examined the legislative history of the Food Stamp Act and determined that Congress intended to focus on a particular group of offenders who knowingly acquired food stamps illegally. *United States v. Marvin,* 687 F.2d at 1227.

Porter's reliance on *Marvin* is unfounded because the statute in this case, 18 U.S.C. § 658, has no language analogous to the "in any manner not authorized by this chapter" language of section 2024(b) that would necessitate giving Porter's proposed instruction. The elements of a section 658 violation are (1) knowingly concealing the property described in the indictment, (2) that the property was mortgaged to a PCA, and (3) that the defendant acted with intent to defraud the PCA. *United States v. Garth,* 773 F.2d 1469, 1477 (5th Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 693 (1986). *See also United States v. Sanders,* 834 F.2d 717, 719 (8th Cir.1987). The trial court properly instructed the jury regarding the need to find intent to defraud.[3] We find no error in the court's instructions.

The judgment is affirmed.

---

**3.** The court gave the following instruction:

The crime of fraudulent concealment of a mortgaged tractor, as charged in Count Twenty-one of the indictment, has three essential elements, which are:

*One,* that the Green Hills Production Credit Association was a production credit association organized under Federal law;

*Two,* that defendant Marvin J. Porter knowingly concealed a 2–135 White diesel tractor, serial number 4007572, of a value in excess of $100.00, which was mortgaged or pledged to the Green Hills Production Credit Association:

*Three,* that defendant Marvin J. Porter acted with intent to defraud the Green Hills Production Credit Association.

To act with "intent to defraud" means to act with intent to cheat, ordinarily for the purpose of causing a financial loss to someone else and bringing about a financial gain to one's self.